613 F.Supp. 1428 (1985)
Complaint of CHEVRON TRANSPORT CORPORATION, as Owner of the SS ROBERT WATT MILLER in an action for exoneration from or limitation of liability.
Vivian Marie SELF, as Administratrix of the Estate of Danny Joe Self, deceased, et al., Plaintiff,
v.
GREAT LAKES DREDGE & DOCK CO., a corporation, Defendant/Third Party Plaintiff,
v.
CHEVRON SHIPPING COMPANY, Third Party Defendant.
GREAT LAKES DREDGE & DOCK CO., a corporation, Plaintiff,
v.
CHEVRON SHIPPING COMPANY and Italia Societe Per Az Di Nav., Defendants.
Nos. 75-114-Civ-J-M, 75-126-Civ-J-M and 77-635-Civ-J-M.
United States District Court, M.D. Florida, Jacksonville Division.
July 19, 1985.
*1429 *1430 *1431 Leonard C. Jaques, Detroit, Mich., for plaintiff V. Self.
Dewey R. Villareal, Tampa, Fla., Courtney W. Stanton, Jacksonville, Fla., for Great Lakes.
G. Morton Good, Miami, Fla., Richard Rumrell, Jacksonville, Fla., for Chevron.
DANIEL HOLCOMBE THOMAS, District Judge.
These consolidated cases were heard by the Court sitting without a jury between January 28 and February 7, 1985. The matter was taken under advisement on April 5, 1985, and after due consideration the Court issues the following opinion:

BACKGROUND
On February 5, 1975, the Robert Watt Miller struck the dredge Alaska and barge GL 142 in The Drummond Creek Range Channel of the St. Johns River, Jacksonville, Florida. As a result of the accident, the Alaska, the GL 142 and the Robert Watt Miller sustained damage. A number of crew members on the dredge were injured; two lost their lives.
Each of the death and personal injury claimants instituted separate actions against their employer, Great Lakes Dredge & Dock Co. Great Lakes in turn filed third-party complaints in each action against Chevron Shipping Co., as operator of the Robert Watt Miller. Great Lakes also filed suit against Chevron Shipping Co. and Italia Societe Per Az Di Nav. As owner of the Robert Watt Miller, Chevron Transport Corporation filed a complaint seeking exoneration from or limitation of liability.
Both Chevron Shipping and Chevron Transport settled with all of the personal injury and death claimants. Judge Melton ordered the third-party complaint severed and the case in chief was tried before a jury. The jury heard the case in Jacksonville and returned a verdict in favor of Great Lakes. The Eleventh Circuit reversed that verdict and remanded the case for a new trial. Ebanks v. Great Lakes Dredge & Dock Co., 688 F.2d 716, 719 (11th Cir.1982).
Following the Ebanks decision this court consolidated all pending actions for a trial to be held beginning January 28, 1985. The only case pending regarding death or personal injury is the case by Vivian Self, as Administratrix of the Estate of Danny Self, (a jury was waived in this case); Great Lakes settled with the other plaintiffs. In addition, the liability issues only were tried as between Great Lakes and the Chevron Companies; damages therefrom will be tried at a later date.

PARTIES
Great Lakes Dredge & Dock Co. was the owner and operator of the dredge Alaska and the barge GL 142. The Alaska was a non-self propelled cutterhead dredge 208 feet in length, 46 feet in breadth and 11.8 feet in depth. On February 5, 1975, she was drawing 9 feet forward and 9 feet aft. The GL 142 was a non-self propelled barge 160 feet in length, 52 feet in breadth and 8.6 feet in depth. On February 5, she was drawing 3 feet forward and 3 feet aft. The Alaska's after end was connected to the forward end of the GL 142 by couplings on both the port and starboard sides. On the after end of the GL 142 was a structure consisting of two spuds such that each spud could be lowered or raised to hold the flotilla in position.
Chevron Transport Corporation was the owner of the Robert Watt Miller. The vessel was being operated under a management agreement with Chevron Shipping Company. The Robert Watt Miller was an oil tanker of Liberian registry 625 feet in length, 84 feet in breadth and 44 feet in *1432 depth. On February 5, she was drawing 24 feet forward and 28 feet aft.
Danny Joe Self, plaintiff's decedent, was a seaman and member of the crew of the Alaska. On February 5, 1975, he lost his life while engaged in the performance of seaman's duties for his employer, Great Lakes. Vivian Marie Self, the decedent's widow brings her action as Administratrix of the Self Estate and as mother and natural guardian of the couple's children, Deana, age 4 at the time of the accident and Danny, Jr. age 2 at that time.

STATEMENT OF FACTS
Great Lakes entered into a contract with the United States Corps of Engineers for the purpose of deepening the channel leading to the Jacksonville, Florida, harbor. On November 27, 1974, the Coast Guard published a local notice to mariners to give notice to shipping interests that the Alaska would be engaged in dredging operations in the St. Johns River. The operation was a project to dredge the channel to 38 feet. Dredging was begun in the Drummond Creek Range on December 26, 1974.
The Robert Watt Miller came to Jacksonville from Port Everglades, Florida arriving on February 5, 1975, at approximately 7:12 A.M. Pursuant to compulsory pilotage laws, Pilot Henry Steele boarded the Robert Watt Miller in order to take the vessel to the Eastern Seaboard docks to discharge a cargo of oil. Due to restricted visibility in the early morning, Steele waited until 9:48 A.M. to prepare to enter the harbor. After the pilot checked the navigational gear and synchronized the clocks, the anchors were raised at 10:27 A.M.; the Robert Watt Miller then proceeded inbound. At this time the current was ebbing toward the mouth of the river at about 1.5 knots. Visibility was good.
The Robert Watt Miller passed Fulton Cut at 11:29 full ahead. The speed was reduced to half ahead at 11:40 and the vessel passed Blount Island. The speed was reduced to dead slow and stop at 11:43 as the tanker passed Blount Island Terminal. At 11:45 the speed was increased to full ahead.
As the Robert Watt Miller proceeded around Dame Point Turn approaching Broward Point Turn, Captain Steele became aware of the Tug Warrengas ahead. The tug was pushing a loaded barge proceeding upstream. The Robert Watt Miller was put full ahead and passed the Warrengas on the port side.
Knowing the dredge Alaska was in the area Captain Steele called the dredge on VHF radio channel 13. The exact words spoken by Steele and the response of the leverman aboard the dredge are unknown. The conversation was such that the Robert Watt Miller informed the Alaska that she was a tanker drawing approximately 28 feet and would arrive in the vicinity of the Alaska within 20 minutes. The Alaska responded giving the tanker permission to make a port to port (one whistle) passing. At the time of this conversation neither vessel could see the other because of the obstruction caused by Quarantine Island.
After making his final turns to line up in Drummond Creek Range, Captain Steele, for the first time saw where the dredge was positioned. He concluded that the stern of the dredge's idler barge was encroaching into his side of the channel by 25 feet. Steele reached this conclusion using reference to a church steeple and a notch in some trees. Neither Steele nor the Master checked the Robert Watt Miller's position with respect to the Range marked by the Coast Guard nor was a compass bearing taken on the Alaska. To remedy the perceived problem of the encroachment and to provide ample passing space the pilot set a course close to the north side of the channel.
The leverman onboard the Alaska saw the bow of the Robert Watt Miller at about 12:02. At that time he stopped dredging and swung the dredge to a position such that the starboard bow of the dredge was to the south bank of the channel.
In the vicinity of the Gulf dock, located approximately at buoy # 59, the pilot and master of the Robert Watt Miller noticed a decided sheer of the vessel to port. Consequently, *1433 an order of 10 degrees right rudder was given. The sheer continued and an order of 20 degrees right rudder was given. The master then initiated an order of hard starboard rudder and full ahead on the engines. That order was given at 12:09 but the sheer continued so a full astern was ordered at 12:11.
Immediately before impact the pilot of the Robert Watt Miller radioed a warning to the Alaska informing the leverman to clear the dredge and barge of all personnel. He also blew the warning whistle. At about the same time the operator of the dredge's tender tug Tarheel State, lying on the port side of the Alaska, saw the danger, sounded the tug's whistle and moved out of the path of the Robert Watt Miller.
Between 12:10 and 12:12, the time having not been exactly established, the bow of the Robert Watt Miller struck the Alaska. The bow first contacted the dredge's port anchor boom, then struck the hull about 100 feet aft of the bow. The impact broke the coupling between the Alaska and the GL 142. The Robert Watt Miller slipped down the side of the Alaska, came into contact with the Barge thus causing her to be loosened from the connections to the dredge. The momentum of the Robert Watt Miller continued forward along the GL 142 and rolled the barge over on her starboard side. The Robert Watt Miller's engines were stopped at 12:13.
When the Barge rolled over several crewmen were injured; two, including the plaintiff's decedent, lost their lives. The plaintiff's decedent, Danny Self, was a deckhand aboard the Alaska. Around noon on February 5, 1975, he and other crew members gathered in the mess hall for lunch. One minute prior to collision one of Self's fellow crewmen went to the door of the mess hall, saw the Robert Watt Miller and yelled out to the others. At this time the men ran from the mess hall aft to the port side to a ladder near the stern. They continued down the ladder to the main deck and across the gangway to the barge. The men had just reached the barge when the impact of the Robert Watt Miller rolled it over. Eleven crew members were cast into the water.
Immediately, rescue attempts were made by the dredge's tender tugs, the survey boat Canaveral and a small fishing boat. In addition, crew members of the Alaska and the Robert Watt Miller threw life rings and flotation equipment attempting to save the men in the water.
Burke, a crew member of the Alaska, had grabbed his life jacket from the handrail when leaving the mess hall. He attempted to save Self by holding on to him, but the suction and current proved stronger than the grips of Self and Burke. Self was pulled away and lost his life.

JURISDICTION
This Court has jurisdiction of the subject matter under 28 U.S.C. § 1331, this being an action at law by virtue of Section 20 of the Jones Act, 46 U.S.C. § 688, and under 28 U.S.C. § 1333. This Court has jurisdiction of all of the parties.

THE SHEER
The fact is apparent that the immediate cause of this accident was the sheer to the port encountered by the Robert Watt Miller just west of the Gulf Docks in the Drummond Creek Cut. The causes leading up to this sheer were several, the combination of which contributed to cause the accident.
As the evidence at trial showed, the sheer that developed moments prior to collision was sudden. However, if the navigator did not properly navigate his vessel either before or after the sheer occurred then the unexpected nature of the sheer does not operate so as to exonerate the navigator. Seaboard Airline R.R. v. Pan American Petroleum & Transport Co., 199 F.2d 761, 765-66 (5th Cir.1952). Further, a sheer by one vessel into another resulting in collision raises a rebuttable presumption of negligence on the part of the sheering vessel. Atkins v. Lorentzen, 328 F.2d 66, 68 (5th Cir.1964). This presumption can be overcome by a showing that the cause of the accident in no way resulted from a failure of due care on the part of the sheering vessel. Id. at 69.
*1434 Viewing the events prior to and during the sheer of the Robert Watt Miller, the court is convinced that certain acts of negligence by the navigators contributed to the cause of the sheer and consequently the cause of the collision. To begin with, the speed of the tanker through Broward Point Turn heading toward the Alaska was excessive. This excessive speed had a dual effect upon the sheer. First, if the Robert Watt Miller had not been traveling at an excessive speed, the evidence showed that the sheer probably would not have developed. Secondly, had the navigators been traveling at a prudent speed, sufficient reverse power would have been available to break the sheer if or when it did occur.
In addition to the speed, the court must consider the navigators' failure to use the anchors in an attempt to break the sheer. From the evidence presented at trial, it is clear that the ship's anchors, or at least the starboard one, would have been helpful in breaking the sheer or at least reducing the impact of the collision.
Finally, there remains the question of where the ship was being conned with respect to the proximity of the northern bank of the channel. Pilot Steele placed the tanker far to her starboard (northern bank) because of his perception of the position of the Alaska. Evidence at trial indicated that the range used by Steele tended to direct the vessel well over toward the right hand (northern) side of the channel, which was a causal factor in the sheer and ultimately the collision.
In view of the preceeding, it is clear that the navigation of the Robert Watt Miller both before and during the sheer contributed in causing and/or amplifying the effect of the sheer. Hence, the presumption of negligence attributed to the sheering vessel has not been successfully rebutted.

NEGLIGENCE OF THE MASTER OF THE ROBERT WATT MILLER
At all material times the Robert Watt Miller was under the command of Captain Mario Stillitano, an Italian national. From the time the tanker's anchors were raised on the morning of February 5, 1975, until the time of the collision, Captain Stillitano was on the bridge observing the navigation of the vessel. During the inbound voyage the master delegated to compulsory pilot Henry Steele the duty of giving orders to the helmsman and to the engine room.[1]
Since the navigators of the Robert Watt Miller included both Captain Stillitano and the compulsory pilot, Captain Steele, the court must consider several factors. As a threshold consideration the court notes that when a vessel is being operated by a compulsory pilot, the vessel is liable in rem only; the owner has no in personam liability unless there is some personal involvement or negligence that can be attributed to the master or crew. The China, 74 U.S. (7 Wall) 53, 19 L.Ed. 67 (1868). However, the exemption from in personam liability applies only "where the pilot is actually in charge of the vessel, and solely in fault." Id. at 64. The China also holds that the party claiming the exemption has the burden of proving "the pilot was in fault, and that there was no fault on the part of the officers or crew, `which might have been in any degree conducive to the damage.'"[2]Id.
*1435 In the collision that occurred in this matter, the pilot was negligent; however, the master of the Robert Watt Miller was also guilty of negligence. The evidence indicates that Captain Stillitano was not even aware of the presence of the Alaska dredging in Drummond Creek Range until minutes prior to the collision. This is true in spite of a notice to mariners published by the Coast Guard on November 27, 1974. A reasonable shipmaster preparing to enter an unfamiliar channel would in the exercise of due care review the notices to mariners and ascertain from the pilot other information about extraordinary situations. The master's failure to avail himself to this information prevented him from skillfully supervising the pilot's conning of the ship in this situation. This negligence in turn led to the chain of events that caused the collision.
Further evidence of negligence by the master is seen in his failure to determine the precise location of his ship with respect to the Alaska and the available channel. The dredge was positioned at an angle which made it difficult for the navigators to determine the exact location of the flotilla, consequently the pilot set a course too far to the right bank. Captain Stillitano should have used due care and checked the position of the Alaska and GL 142 with respect to the position of the Robert Watt Miller by use of recognized and available navigational equipment instead of depending on Pilot Steele's use of bearings on antiquated land fixtures. This negligence was a contributing cause of this collision. Even though it is acceptably sound practice for a captain to rely on the judgment of a compulsory pilot, there come times which not only justify but require the captain in fulfilling his duty to supervise the pilot's conning of the vessel to question the soundness of this judgment.
Chevron has failed to establish that the faults of the master were not "conducive to the damage" in this matter. As a result, in personam liability lies against those in charge of the Robert Watt Miller.

THE POSITION OF THE ALASKA/GL 142
Prior to the commencement of dredging operations Great Lakes' project engineer, Martin Snow, established a "digging range" using conventional civil engineering land surveying techniques. The digging range was parallel to and fifty feet to the southeast of the Drummond Creek navigation range established by the Coast Guard. To mark this digging range a laser beam was used. The dredge and barge could be positioned with its longitudinal centerline 50 feet south of the centerline of the channel by putting the vessel's head gyro on the channel range and then standing on the centerline of the vessel looking aft to locate the laser beam and shifting the dredge to place the beam midship of the dredge. The horizontal dispersion of the laser beam was four inches per mile.
Great Lakes checked the operation of the laser transmitter at least daily. On the morning in question the position of the dredge was checked with respect to the laser beam sometime between 10:00 and 11:00 A.M. The court is convinced that the equipment was in place, in order and functioning as it was intended at all material times.
At trial a dispute arose concerning the location of the dredge with respect to the centerline of the channel, that is, whether the dredge was properly aligned on the laser beam. It was uncontroverted that once the Alaska's leverman saw the Robert Watt Miller come into the dredge's vicinity, he discontinued dredging and swung the bow of the Alaska to her far starboard bank out of the channel. Neither party presented convincing evidence as to the position of the port quarter of the barge in relation to the centerline of the channel. However, it was established that the swing of the Alaska placed the dredge and barge at an angle occupying the descending half of the channel.
The Pilot Rules for Inland Waters, 33 C.F.R. § 80.26(b), in force at the time in question, required a dredge to "straighten out" within the cut after giving an approaching *1436 vessel the signal that the channel is clear. Clearly, the Alaska and GL 142, lying at an angle, violated this provision. When a statutory provision is violated The Pennsylvania rule is applicable. The Pennsylvania rule shifts the burden of proof to the violator of a statutory rule intended to prevent collisions to show "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been [a cause of the collision]." The Pennsylvania, 86 U.S. (19 Wall) 125, 136, 22 L.Ed. 148 (1873). The rule is not one of liability but shifts the burden of proof as to the causation. Orange Beach Water, Sewer and Fire Protection Authority v. M/V Alva, 680 F.2d 1374, 1381 (11th Cir.1982); Garner v. Cities Service Tankers Corp., 456 F.2d 476, 480 (5th Cir.1972). In determining the boundaries of the rule, the Former Fifth Circuit held that the rule was not meant to require every vessel guilty of a statutory fault to prove that "its fault could not by any stretch of the imagination have any causal relation to the collision, no matter how speculative, improbable, or remote." Compania De Maderas De Caibarien v. The Queenston Heights, 220 F.2d 120, 122 (5th Cir.1955).
The angle at which the Alaska and GL 142 was positioned in the Drummond Creek Cut distorted the perception of the navigators of the Robert Watt Miller as the tanker came around Broward Point Turn. Regardless of whether the navigators used Pilot Steele's method of locating the range or the established ranges the position of the dredge and barge caused problems in the determination of a prudent course to set to safely pass the flotilla. In so stating, the court does not retract its previous holding that the pilot used a faulty range and that he and the master were negligent in failing to use recognized and available navigational equipment to determine the relative positions of the entities involved. Instead, this court holds that the angle at which the Alaska and GL 142 was positioned coupled with the flotilla's location on the St. John's River was a contributing cause of this accident. Hence, Great Lakes has not met its burden under The Pennsylvania rule even as by Queenston Heights, supra, standards of showing that the violation of the statutory rule could not have been a cause of the accident.
A related and very serious consideration concerns the fact that the dredge possessed the status of an anchored vessel while the Robert Watt Miller was a moving vessel. See Al Johnson Construction Co. v. S.S. Rio Orinoco, 249 F.Supp. 182, 189 (E.D.Pa.1965). When a moving vessel strikes an anchored one a presumption of negligence arises on the part of the vessel in motion. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); The Victor, 153 F.2d 200 (5th Cir.1946). The moving vessel is solely liable unless she can prove that the accident was caused by the fault of the anchored vessel or that the accident was inevitable. McCready v. Goldsmith, 59 U.S. (18 How.) 89, 15 L.Ed. 288 (1856). In the instant matter fault has been established on the part of the dredge by operation of The Pennsylvania rule. Thus, the court will weigh the presumption of The Pennsylvania and that of The Oregon in determining proportionate fault of the two vessels in question.

EXONERATION FROM/LIMITATION OF LIABILITY
Chevron Transport, the owner of the Robert Watt Miller, has filed a complaint seeking to limit its liability to the value of its interest in the vessel pursuant to 46 U.S.C. § 183. In order to determine if a shipowner is entitled to limit its liability, the court must first determine what acts of negligence or conditions of unseaworthiness caused the accident and secondly whether the shipowner had privity or knowledge of same. Farrell Lines Inc. v. Jones, 530 F.2d 7, 10 (5th Cir.1976). The initial burden of proving negligence or unseaworthiness rests with the libellants; the petitioner in limitation has the burden of proving lack of privity or knowledge. Coleman v. Jahncke Service, Inc., 341 F.2d 956, 958 (5th Cir.1965).
*1437 As the foregoing discussion illustrates the first part of the test has been met. That is, Great Lakes has proven that Chevron committed various acts of negligence which proximately caused or contributed to the casualty involved here. The weight of the evidence has shown that Chevron allowed its ship, the Robert Watt Miller, to proceed into unfamiliar waters without using ascertainable information to see that the ship's voyage was carried out in a prudent manner. A primary cause of the collision was the fact that the master could not shoulder his duty of due care in the navigation of the Robert Watt Miller because he was completely unaware of of dredging operations on the St. Johns River until the dredge came into sight, thus, could not intelligently oversee the ship's inbound voyage. Aware of this fact the court now moves to the question of privity and knowledge; cognizant of the fact that Chevron has the burden of proving lack of privity or knowledge.
As a preliminary matter the court notes that Chevron Transport delegated the duty of operational management of the Robert Watt Miller to Chevron Shipping. In a corporate owner situation privity and knowledge of those to whom management is delegated is also privity and knowledge of the corporate owner. 341 F.2d at 958. Since the present case involves a corporate owned ocean vessel, the question of privity and knowledge is focused on whether the shore based management is aware of or should have been aware of the likelihood of the occurrence happening after the ship is underway. Tittle v. Aldacosta, 544 F.2d 752, 756 (5th Cir.1977); Avera v. Florida Towing Corp. 322 F.2d 155 (5th Cir.1963).
Chevron Shipping undertook the responsibility of distributing to its vessels the applicable notices to mariners. However, the distribution system used was far from adequate and there is no evidence that the notice concerning dredging operations in the St. Johns River channel ever reached the Robert Watt Miller. Chevron Shipping's port superintendent testified that had he been aware that a dredge was working in the channel he would have ordered tugs to escort the tanker past the dredging operations to its intended berth. Obviously, management personnel at Chevron Shipping should have been aware of the likelihood of an accident. Due to their failure to disseminate this information to those who Chevron had entrusted to navigate their vessels and because Chevron Transport had knowledge of this situation through its corporate manager, Chevron Shipping, it is not entitled to limit its liability. Limitation of liability must be denied.

THE DANNY SELF CLAIM
Danny Self, as a deckhand assigned to work on the dredge Alaska, was a seaman within the meaning of the Jones Act, 46 U.S.C. § 688. In bringing a death action on her husband's behalf, Mrs. Self asserts that Great Lakes was negligent in failing to drill the crew, in failing to provide lifesaving/rescue skiffs and in failing to provide Danny Self with a life jacket and instructions regarding its use.
As a part of its contract with the government to dredge Drummond Creek Range, Great Lakes undertook to abide by the provisions of the Corps of Engineers Safety Manual No. EM 385-1-1. Among the provisions of the Manual was one requiring abandon ship drills, fire drills and man overboard or rescue drills. The evidence at trial clearly indicated that Great Lakes had not complied with such requirements.
Another provision of the Safety Manual required lifesaving or safety skiffs be provided that were ready for launching, with men trained in the launching. This provision further provided that the skiffs be used only for emergencies and lifesaving drills. Great Lakes did not convince the court that this provision had been complied with or that an approved substitute had been allowed by the Corps.
A claim under the Jones Act requires a finding both of a negligent breach of duty and proximate cause. Myles v. Quinn Menhaden Fisheries, Inc., *1438 302 F.2d 146, 150 (5th Cir.1962). The causative element in Jones Act cases is less than the common law standard of proximate cause. Reyes v. Vantage S.S. Co., Inc., 609 F.2d 140, 146 (5th Cir.1980). The question of proximate cause thereunder focuses upon whether the actions of the defendant contributed to the injury even in the slightest degree. Sanford Brothers Boats, Inc. v. Vidrine, 412 F.2d 958, 966 (5th Cir.1969). In addition, the employer's negligence need not be the sole proximate cause of an injury to result in liability but need merely be a contributing cause of the accident. Spinks v. Chevron Oil Co., 507 F.2d 216, 221 (5th Cir.1975).
In the instant matter the court concludes that the negligent acts of Chevron and Great Lakes were contributing causes in the accident that led to the death of Danny Self. Therefore, the Self interests have met their burden of proving their Jones Act claim. Thus, the court now moves to the issue of recoverable damages.
To begin with, it is necessary to consider certain factors in reaching the award for damages sustained. At the time of his death, Danny Self, age 22, was earning $4.49 per hour on the Alaska. A reasonable assumption is that Mr. Self would have worked 2,080 hours (52 forty-hour work weeks) per year in order to provide for his family. His work upon the dredge would encompass 1,290 hours (32.25 forty-hour work weeks) in one year. Since the loss suffered by Mrs. Self and her children is the loss of income Mr. Self would have provided, in addition to the 1290 hours per year working on the dredge, the court assumes Mr. Self would also work 790 hours per year (19.75 forty hour work weeks) at a job earning minimum wage. [1,290 hours + 790 hours = 2,080 hours or 52 forty-hour work weeks.]
To reach a just award, the salary amount decedent was receiving as a deckhand must be adjusted to reflect the fact that the decedent would have received salary increases and promotions throughout his working life. See generally, Deakle v. John F. Graham & Sons, 756 F.2d 821 (11th Cir.1985). In making various adjustments and assumptions associated therewith, the court has duly considered the testimony of the two economists produced at trial. Accordingly, the court concludes that decedent would have received salary increases of 7.33% per year and that he would have advanced to the level of mate in 1985 and promoted to leverman in 1995 where he would remain until retirement at age 65.
In addition, the court adjusts the decedent's salary at the time of the accident to reflect the loss of fringe benefits such as pension benefits, health insurance, etc. The court determines the rate of fringe benefits relative to pay is 21.58%. The court further determines that approximately 88% of decedent's pay per year would be straight time and 12% overtime.
The award for damages to Mrs. Self and the two children must also include their loss of household services that Mr. Self would have performed. This loss is computed from the time of the accident through decedent's projected life expectancy by estimating the time spent and the value of those services. In addition, the calculation of damages includes a determination of loss of estate or net estate accumulation. On the other side, the court further adjusts the award to reflect the fact that Mr. Self would consume certain funds to maintain his own personal needs. In determining this amount, the court assumes Self consumed 32% of the family income from 1975 to 1985; 27% from 1985 until 1993 and 34% from 1993 through decedent's life expectancy. This percentage changed due to the ages of the children; that is, after the last child left home, presumably at age 21, Mr. Self would consume more personally.
Therefore, the loss sustained by Mrs. Self and her two children includes: lost of income support, loss of fringe benefits, loss of estate and loss of household services. Consequently, the court concludes that the present day value of the pecuniary loss suffered by Mrs. Self is $414,396.00. Each of the two children would receive support *1439 until age 21; thus, the present day value of the pecuniary loss suffered by Deana Self is $68,819.00 and $78,139.00 for Danny Self, Jr.
The above figures are reached from evaluation of the testimony of the two economists who testified at trial.
Apart from the pecuniary loss the court concludes that the decedent's wife and children suffered certain nonpecuniary losses. That is, the loss of society, love, affection, companionship, guidance and counsel. The court determines this loss to be $70,000.00 to Mrs. Self, $15,000.00 to Deana Self and $15,000.00 to Danny Self, Jr.

APPORTIONMENT OF FAULT
Finally, the court must determine the apportionment of fault between the two parties responsible for the collision. United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); Loose v. Offshore Navigation, Inc., 670 F.2d 493 (5th Cir.1982). The court concludes that 70% of the fault is apportioned to Chevron and 30% of the fault is apportioned to Great Lakes.
As the apportionment of fault illustrates, this case involved joint tort feasors, namely, Great Lakes and Chevron. Since Chevron has settled with the Selfs in this case the question of the amount of plaintiff's recovery arises. The court is of the opinion that the present case is governed by the principles set forth in Leger v. Drilling Well Control, Inc., 592 F.2d 1246 (5th Cir.1979). See Gormly v. Van Ingen, 736 F.2d 624 (11th Cir.1983) (per curiam affirmance applying Leger).[3]
In Leger an employee was injured while working aboard a barge. He sued three separate defendants but settled with two of the defendants prior to trial. At trial the jury apportioned fault among the defendants and found contributory negligence by the plaintiff. The Fifth Circuit affirmed the trial court's rendering judgment against the nonsettling defendant to pay only the portion of the total damages proportionate to his percentage of negligence. In reaching this opinion Judge Fay stated: "Whether the plaintiff obtains a favorable or unfavorable settlement, he may only recover once for each wrongdoer's percentage of fault." Id. at 1250. He further stated that "[i]f a party decides to try a case, it must be prepared to accept whatever benefits or burdens flow from its decision." Id. at 1251.
In the present case the court has assessed the plaintiff's total damages at $661,354.00. Since the plaintiff has settled with and released Chevron but has a viable claim against Great Lakes, then the plaintiff is entitled to recover that portion of the total damages proportionate to Great Lakes' percentage of fault or $198,406.20. [30% of $661,354.00].
NOTES
[1] The master and all licensed officers on the Robert Watt Miller were Italians and the unlicensed crew were all Indians. Although there was some language barriers between the officers and crew they were sufficiently versed in English as related to nautical and navigational terminology that communications presented no difficulties. The Court is convinced that the crew performed as ordered and that there were no miscommunications between the officers and crew which could have been a contributing cause to this casualty.
[2] The court is aware of those cases which require the master to take charge of the vessel only when the pilot is incompetent or incapacitated. See, e.g., Union Co. v. United States, 127 F.2d 771 (5th Cir.1942); Charente Co. v. United States, 12 F.2d 412 (5th Cir.1926); City of Canton [Jure v. United Fruit Co.] 6 F.2d 6 (5th Cir.1925). However, the present case does not reach that issue, but instead focuses on the requirement of The China that the master must be personally free from negligence.
[3] In Ebanks v. Great Lakes Dredge & Dock Co., 688 F.2d 716 (11th Cir.1982), the court held that Leger was inapplicable "because the settling party, Chevron, was not a member of this suit." However, it seems that the converse of that statement would be true here since Chevron was represented at the second trial.