Vivian Marie SELF, as administratrix of the estate of Danny Joe Self, deceased, etc., Plaintiff-Appellee, Cross-Appellant,

v.

GREAT LAKES DREDGE & DOCK COMPANY, a corporation, Defendant, Third Party Plaintiff-Appellant, Cross-Appellee,

and

Chevron Shipping Company, Third Party Defendant, Cross-Appellant.

GREAT LAKES DREDGE & DOCK COMPANY, a corporation, Plaintiff-Appellant, Cross-Appellee,

v.

CHEVRON SHIPPING COMPANY, Defendant-Appellee, Cross-Appellant,

and

Italia Societer Per Az Di Nav, Defendant.

Complaint of CHEVRON TRANSPORT CORPORATION, as owner of the S/S ROBERT WATT MILLER, in an action for exoneration from or limitation of liability, Plaintiff-Appellee, Cross-Appellant,

Great Lakes Dredge & Dock Company, a corporation, Claimant-Appellant, Cross-Appellee.

No. 85–3673.

United States Court of Appeals, Eleventh Circuit.

Dec. 1, 1987.

Rehearing and Rehearing En Banc Denied Jan. 6, 1988.

**1542**

Dewey R. Villareal, Jr., Carl R. Nelson, Tampa, Fla., Courtney W. Stanton, Jacksonville, Fla., John M. Kops, Warren M. Faris, New Orleans, La., for Great Lakes Dredge & Dock Co.

G. Morton Good, Miami, Fla., Richard G. Rumrell, Jacksonville, Fla., for Chevron Shipping Co. & Chevron Transport Corp.

Leonard C. Jaques, Detroit, Mich., for Self.

Before CLARK, EDMONDSON and KEITH[*], Circuit Judges.

CLARK, Circuit Judge:

On February 5, 1975, the ship Robert Watt Miller struck the dredge Alaska and a barge in the St. Johns River near Jacksonville, Florida. A number of seamen were killed or injured in the accident, and this litigation ensued. After over twelve years of proceedings, this case is now before this court for a second time. In the earlier appeal, *Ebanks v. Great Lakes Dredge & Dock Co.*, 688 F.2d 716 (11th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983), this court reversed the judgment of the district court because of errors that led to findings of negligence but no award of damages. On remand, the district court conducted a nonjury trial, found negligence, awarded damages, but limited damages because of a settlement by the plaintiff with one of the parties. *See In re Chevron Transport Corp.*, 613 F.Supp. 1428 (M.D.Fla.1985). All parties

[*] Honorable Damon J. Keith, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

appealed to this court raising at least twelve issues altogether. For the reasons discussed below, we affirm in part and reverse in part the judgment of the district court.

## I. FACTS

The background and facts of this case are extensively detailed by the district court, *see* 613 F.Supp. at 1431–33, and in this court's earlier opinion, *see* 688 F.2d at 717, and will only be summarized here.

### A. *The Parties*

Great Lakes Dredge and Dock Company ("Great Lakes") was the owner and operator of the dredge Alaska and the barge involved in the accident. The Chevron Transport Corporation owned the ship Robert Watt Miller, which collided with the barge and dredge. The vessel was operated by Chevron Shipping Company (collectively "Chevron" unless otherwise noted).

Vivian Marie Self is the widow of Danny Joe Self, a seaman and member of the crew of the barge (collectively "Self" unless otherwise noted). While engaged in the performance of his duties for his employer, Great Lakes, Danny Self lost his life in the accident. Vivian Self was one of the original plaintiffs in this action, which included claims of injured seamen and the representative of the one other seaman who lost his life in the accident. All plaintiffs other than Self have settled their claims. The case is an action at law under § 20 of the Jones Act, 46 U.S.C. § 688 and under general maritime law. *See Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

### B. *The Accident*

To briefly summarize, at a little before noon on February 5, 1975, the Robert Watt Miller was proceeding at full speed up the St. Johns River approaching the Port of Jacksonville. The pilot of the vessel, knowing the Alaska was in the area, radioed to inform the dredge that the ship would soon be passing. The Robert Watt Miller came around a turn in the channel and saw for the first time the placement of the dredge and barge. Based only on visual estimates, the pilot guided the Robert Watt Miller to the north side of the channel. The leverman of the dredge Alaska, when he saw the Robert Watt Miller, stopped dredging and swung the bow of the dredge toward the south bank of the channel.

As the Robert Watt Miller continued up the channel, the pilot and master of the ship noticed a significant sheer of the vessel to port, toward the south side of the channel. According to the district court, an order of 10 degrees right rudder was given. The sheer continued and an order of 20 degrees right rudder was given. The master then initiated an order of hard starboard rudder and full ahead on the engines. That order was given at 12:09 but the sheer continued so a full astern was ordered at 12:11.

Immediately before impact the pilot of the Robert Watt Miller radioed a warning to the Alaska informing the leverman to clear the dredge and barge of all personnel. He also blew the warning whistle. At about the same time the operator of the dredge's tender tug Tarheel State, lying on the port side of the Alaska, saw the danger, sounded the tug's whistle and moved out of the path of the Robert Watt Miller.

Between 12:10 and 12:12, the time having not been exactly established, the bow of the Robert Watt Miller struck the Alaska. The bow first contacted the dredge's port anchor boom, then struck the hull about 100 feet aft of the bow. The impact broke the coupling between the Alaska and the [barge]. The Robert Watt Miller slipped down the side of the Alaska, came into contact with the Barge thus causing her to be loosened from the connections to the dredge. The momentum of the Robert Watt Miller continued forward along the [barge] and rolled the barge over on her starboard side. The Robert Watt Miller's engines were stopped at 12:13.

When the Barge rolled over several crewmen were injured; two, including the plaintiff's decedent, lost their lives. The plaintiff's decedent, Danny Self, was

a deckhand aboard the Alaska. Around noon on February 5, 1975, he and other crew members gathered in the mess hall for lunch. One minute prior to collision one of Self's fellow crewmen went to the door of the mess hall, saw the Robert Watt Miller and yelled out to the others. At this time the men ran from the mess hall aft to the port side to a ladder near the stern. They continued down the ladder to the main deck and across the gangway to the barge. The men had just reached the barge when the impact of the Robert Watt Miller rolled it over. Eleven crew members were cast into the water.

Immediately, rescue attempts were made by the dredge's tender tugs, the survey boat Canaveral and a small fishing boat. In addition, crew members of the Alaska and the Robert Watt Miller threw life rings and flotation equipment attempting to save the men in the water.

Burke, a crew member of the Alaska, had grabbed his life jacket from the handrail when leaving the mess hall. He attempted to save Self by holding on to him, but the suction and current prove stronger than the grips of Self and Burke. Self was pulled away and lost his life.

*In re Chevron Transport Corp.,* 613 F.Supp. at 1433.

C. *The Litigation*

Each of the death and personal injury claimants instituted separate actions against their employer, Great Lakes Dredge & Dock Co. Great Lakes in turn filed third-party complaints in each action against Chevron Shipping Co., as operator of the Robert Watt Miller. Great Lakes also filed suit against Chevron Shipping Co. and Italia Societe Per Az Di Nav. As owner of the Robert Watt Miller, Chevron Transport Corporation filed a complaint seeking exoneration from or limitation of liability.

613 F.Supp. at 1431. Both Chevron companies settled with all of the personal injury

and death claimants, including Self. Chevron paid Self the sum of $315,000. The original trial judge severed the third-party complaints and conducted a jury trial between the personal injury plaintiffs and Great Lakes. The jury found that Great Lakes was negligent but found that Great Lakes was not liable to the plaintiffs. For reasons explained in *Ebanks,* this court reversed. On remand, a different district judge consolidated the pending actions for a nonjury trial. All of the personal injury claimants except for Self settled with Great Lakes. At trial, Self's claims against Great Lakes were tried as well as liability issues between Great Lakes and Chevron. The issues of Chevron's and Great Lakes' damages were reserved for later trial.

At trial, all three major parties (Self, Great Lakes, and Chevron) made allegations about causes of the accident and the injuries to seamen. Self alleged that Great Lakes failed to comply with various safety regulations requiring lookouts, life preservers, safety skiffs, and emergency drills. Self and Chevron alleged that Great Lakes improperly positioned the barge and dredge in the channel. Great Lakes alleged that Chevron negligently allowed its vessel to travel through the channel with insufficient information about the location of the dredge. Evidence on these and other claims were presented at trial.

The trial judge ruled that Chevron was negligent and liable because of the sheer of the vessel and that Great Lakes was liable because of the placement of the dredge and barge in the channel. The court found that Self's total damages amounted to $661,-354.00 and that Chevron bore 70% of the fault for the accident while Great Lakes bore 30%. Because Self had already settled with Chevron, and because the trial court was of the view that this court's opinion in *Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246 (5th Cir.1979),[1] required an apportionment of damages, the court awarded Self a judgment of $198,406.20 against Great Lakes, which represents 30%

---

1. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

of Self's total damages. The details of the rulings challenged on appeal are discussed more fully below.

### D. *This Appeal*

On appeal all three parties are proceeding as appellants or cross-appellants challenging rulings made by the district court below. In the six briefs filed on appeal, at least twelve issues are raised, and in this opinion we must reach all but two of the points raised. For the most part, we will address the issues in the order in which they were presented to this court.

### II. SELF'S CLAIMS AGAINST GREAT LAKES

The trial court found that Great Lakes negligently breached its duty to Danny Self by failing to follow Corps of Engineers safety regulations as required by Great Lakes' dredging contract with the government. 613 F.Supp. at 1437. The court also found that Great Lakes' negligence was a proximate cause of the drowning of Self. *Id.* at 1438. Although in its initial brief Great Lakes did not directly challenge these findings on appeal, we note as a preliminary matter that they are fully supported by the record and the applicable law. We must thus address Self's claims on appeal—challenges to the amount and apportionment of damages.

### A. *Apportionment of Damages*

In this appeal Self challenges the application by the district court of apportionment principles set out by this court in *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246 (5th Cir.1979), to the award of damages to Self. Because the court determined that Great Lakes was 30% responsible for the accident, and because Self had settled with Chevron (which was found by the district court to be 70% responsible), the court awarded Self only 30% of the total damages of $661,354. Chevron had paid Self

$315,000 and taken a release. The district court was of the opinion that *Leger* required this result, which meant that Self received compensation in the sum of $513,-406.20, or $147,948.80 less than the total damages of $661,354.

To understand *Leger*, it is necessary to briefly review the law controlling the apportionment of damages in maritime cases. As early as 1855, it was the law in American courts that damages arising from a maritime collision should be equally divided among joint tortfeasors, regardless of their degree of responsibility for the collision. *See The Schooner Catharine v. Dickinson*, 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1855). The Supreme Court in *The Schooner Catharine* drew on earlier English law that required equal division of damages. Then, in 1975, finding the United States to be "virtually alone among the world's major maritime nations" in adhering to the equal division of damages rule, the Supreme Court overturned *The Schooner Catharine* and adopted a rule of proportional fault for liability for property damage arising from maritime collisions. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 403, 95 S.Ct. 1708, 1712, 44 L.Ed.2d 251 (1975).[2] *Reliable Transfer* did not address liability for personal injuries caused by a maritime collision.

The Fifth Circuit in *Leger* extended the proportional fault rule of *Reliable Transfer* to reach personal injuries. 592 F.2d at 1249.[3] The *Leger* court then endorsed a rule set out by the district court requiring that "the judgment awarded to the claimant against a nonsettling defendant is credited with the dollar amount represented by the proportion of negligence, if any, attributed to the settling parties." *Id.* at 1248. The court in *Leger* explicitly took the approach that the plaintiff who settles with one joint tortfeasor takes the benefit, or burden, of his bargain. If he makes a

---

**2.** The primary holding in *Reliable Transfer* is narrow and relatively simple: "We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among parties propor-

tionately to the comparative degree of their fault...." 421 U.S. at 411, 95 S.Ct. at 1715–16.

**3.** We have no doubts about the correctness of this aspect of the *Leger* holding.

"good" settlement, he could receive total compensation more than his actual damages, while if he makes a "bad" settlement he would receive less than his actual damages. *Id.* at 1250 & n. 9.[4]

Two months after this court issued its opinion in *Leger*, the Supreme Court decided *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979). The *Edmonds* opinion included language that cast serious doubt over the full implications of the *Leger* approach. In the wake of *Edmonds*, the Eleventh Circuit backed away from and disavowed certain aspects of *Leger*. *See Ebanks v. Great Lakes Dredge & Dock Co.*, 688 F.2d 716 (11th Cir.1982); *Drake Towing Company v. Meisner Marine Construction Company*, 765 F.2d 1060 (11th Cir.1985).

Although not directly related to the holding in the case, the Court's opinion in *Edmonds* strongly and repeatedly reaffirmed the right of a plaintiff to recover from any single tortfeasor the full compensation for damages incurred. " 'Nothing is more clear than the right of a plaintiff, having suffered such a loss, to sue in a common-law action all the wrong-doers, or anyone of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss.' " 443 U.S. at 260 n. 9, 99 S.Ct. at 527 n. 9 (quoting *The Atlas*, 93 U.S. 302, 23 L.Ed. 863 (1876)). The Court noted that a "concurrent tortfeasor generally may seek contribution from another, but he is not relieved from liability for the entire damages even when the nondefendant tortfeasor is immune from liability." 443 U.S. at 260 n. 8, 99 S.Ct. at 527 n. 8.

■ The Supreme Court in *Edmonds* specifically considered the implications of its opinion in *United States v. Reliable Transfer*, on which the *Leger* decision is based: "[In *Reliable Transfer*] we did not upset the rule that the plaintiff may recover from *one* of the colliding vessels the damage concurrently caused by the negligence of both." *Id.* at 271 n. 30, 99 S.Ct. at 534 n. 30 (emphasis in original). The Court noted that "[c]ontribution remedies the unjust enrichment of the concurrent tortfeasor, and while it may sometimes limit the ultimate loss of the tortfeasor chosen by the plaintiff, it does not justify allocating more of the loss to the innocent employee, who was not unjustly enriched." *Id.* In our opinion, this statement rejects the philosophy in the *Leger* case that it is the plaintiff who bears the loss or obtains the gain under facts such as are in this case. The philosophy governing *Edmonds* is clear: any inequity which results from the implementation of a seaman's damage award should be borne by the tortfeasors rather than the seaman himself. *Joia v. Jo-Jo Service Corp.*, 817 F.2d 908, 917 (1st Cir.1987).

In *Ebanks*, this court's earlier opinion in this case, the panel considered the language quoted above and concluded that "[*Leger's*] effect as precedent has been weakened by *Edmonds*." 688 F.2d at 720. Then, in *Drake Towing*, the court ordered that one joint tortfeasor pay full damages (less that attributable to the plaintiff's own negligence), even though the plaintiff had already settled with another joint tortfeasor. *See* 765 F.2d at 1067. The court considered the *Leger* opinion, and described the *Leger* holding in extremely narrow terms, thereby construing *Leger* to avoid a conflict with the approach endorsed by the Supreme Court in *Edmonds*. At least one other circuit court has determined that the *Leger* approach cannot withstand the more recent *Edmonds* opinion; that court specifically approved of this court's *Ebanks* deci-

4. In *Leger*, the plaintiff made a "good" settlement and ultimately received $310,171.05 in compensation for his injuries, even though the injuries amounted to only $284,090.00. Similarly, in the primary Eleventh Circuit case to follow *Leger*, the plaintiff received $121,000 in compensation although his damages were only $60,000. *See Gormly v. Van Ingen*, 736 F.2d 624, 625 (11th Cir.1983). The *Leger* court overlooked in its calculations that Travelers Insurance Company received $82,331 of the $127,840 received by Leger from Dresser, leaving Leger with $246,321 ($63,920 balance plus $182,331 initially paid by Travelers). Thus, Leger received less than the total damages awarded.

sion, while specifically rejecting *Leger*. See *Joia*, 817 F.2d at 915–17.

We conclude that the district court erred in relying upon the *Leger* opinion in requiring Great Lakes to pay Self only $198,-406.20 instead of $356,350. As we previously mentioned, although this court in *Ebanks* reversed the district court in this case because of a misapplication of the *Leger* principles, it is not altogether surprising that on remand the district court (through a different district judge) again misapplied *Leger*. The *Ebanks* case, in not following *Leger*, relied in part on the fact that in *Leger* all tortfeasors were before the court and jury for the sole purpose of allocating to each tortfeasor its percentage of liability for paying Leger's damages in the amount of $284,090, awarded to Leger in a prior jury trial.

> The trial court granted Dresser's motion for a new trial on the ground that the jury should have been informed that DWC and Continental were originally defendants, that Leger had settled his claims against them, and that Travelers was to receive one-half of all sums received by Leger from Dresser. The court considered it necessary that the jury be aware of the continuing interest in the law suit of the various witnesses from DWC and Continental.

*Leger*, 592 F.2d at 1247.

*Leger* thus differs from this case because Chevron was not before the court in the trial of this case at the first trial but was a party in this second trial for the purpose of assessing liability between Chevron and Great Lakes as to their purported claims against each other. However, at no time after the settlement did Self seek any further damages from Chevron. Under the principle announced in *Luke v. Signal Oil & Gas Co.*, 523 F.2d 1190 (5th Cir.1975), contributions cannot be obtained by one tortfeasor from a tortfeasor who has settled with and been released by the claimant. The purpose of the second trial in this case was not the same as the second trial in the *Leger* case, which had as its sole purpose the apportionment of damages between the tortfeasors.

There are other facts that distinguish this case from those very peculiar facts in *Leger*. As mentioned previously, Travelers' policyholders, DWC and Continental, had a monetary interest in the amount of damages collected by Leger from non-settling codefendant Dresser. Their interest in Leger's damages was that Travelers was to receive one-half of any funds collected by Leger from Dresser. There is no similar agreement in this case. Another distinctive fact was that in the second trial on the sole issue of the apportionment of liability amongst the three tortfeasors, DWC, Leger's employer was found to be guilty of no negligence, thus skewing the award of damages in the amount of $82,331.05 paid by Travelers in DWC's behalf to Leger in settlement. Thus, this sum was not used in reducing the judgment and was a windfall to Leger, which offset in part the sum that Leger had to pay to Travelers. The last distinctive difference between the *Leger* case and this one is that Leger was found to be 35% contributorily negligent, which affected the complicated calculations.

Because of these distinctions, namely the change in the law by *Edmonds* and *Ebanks*, and the differences in the facts, we do not consider *Leger* as controlling our opinion in this case.

We do not overlook the fact that in a case such as this, a joint tortfeasor may be left paying a higher or lower percentage of the damages than it caused. Nor do we overlook the rule that there may be joint contribution amongst tortfeasors in an admiralty case and that in the absence of a settlement, the amount of contribution turns on the percentage of fault of each joint tortfeasor. See *Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). *Leger* upheld that "settling defendants are relieved of any further liability to the plaintiff." 592 F.2d at 1248 (relying upon *Luke v. Signal Oil & Gas Co.*, *supra*.). It is obvious that the rule announced in *Luke* overrides the right of contribution.

We acknowledge that the rule that we adopt today may cause disparity in the

percentage of payment as between the settling and nonsettling tortfeasors in maritime personal injury actions. We note, however, that this court is not unique in adopting such a rule. Among those states that have incorporated comparative fault principles into their tort systems, but have retained the rule that there is no contribution from settling tortfeasors, there is a split of authority as to how a nonsettling tortfeasor's share of damages should be calculated. Some states have adopted the rule that *Leger* employed, while others require that the nonsettling tortfeasor's share be reduced only by the amount paid by a settling tortfeasor. Prosser and Keeton, *The Law of Torts*, § 67 at 476 (5th ed. 1984).

■ As we are bound by the Supreme Court's guidance and the rule in *Edmonds*, we adopt the latter of these approaches.[5] We hold that Self can recover from Great Lakes the full damages, less the amount already recovered from Chevron through the settlement. The *Leger* approach has much merit in terms of efficiency and realistic settlement practices, but *Edmonds* and Eleventh Circuit cases following *Edmonds* require this result.[6]

Finally, we note that the remedial nature of general maritime law, and the Jones Act in particular, support this result. "The joint and several loss allocating mechanism which serves to provide an injured seaman

his full judgment is consonant with the policy behind the Jones Act, to provide protection to seamen who are victims of negligence." *Joia,* 817 F.2d at 917 (citations omitted). In cases such as this, the general goal of maritime law is to provide quick and full compensation to the injured seaman, while leaving the primary litigation dispute to the question of which joint tortfeasor is liable for what percentage of the damages. Historically maritime law has treated seamen as in need of special protection; until the Supreme Court suggests otherwise, we cannot move away from that special protection to an arguably more "efficient" system in which an injured seaman is viewed as an equal party with equal bargaining power. Because of our resolution of this claim, we need not reach Self's contention that the trial court erred by apportioning liability based on degrees of fault for the collision, instead of apportioning liability based on degrees of fault for the death of Danny Self. Arguably, because Chevron had nothing to do with the safety violations of Great Lakes, Great Lakes bears a greater degree of responsibility for Self's death than it does for the collision itself. We do not address this argument.

## B. *Specific Findings of Damages*

■ On appeal, Self argues that the district court failed to make adequate findings

5. In doing so, we note that the facts in this case make our decision compelling. Self was innocently eating his lunch on the barge some thirteen years ago as the Robert Watt Miller was bearing down upon the barge. His widow settled her claim and her children's claims with Chevron, owner of the Robert Watt Miller. The claim against Great Lakes is still unpaid and the subject of this appeal. Both tortfeasors were obviously negligent. Self's widow should not be penalized for settling with Chevron; nor should one in her position be forced to await the outcome of a lawsuit between two litigious defendants in order to ensure receipt of damages properly assessed against them.

6. Effectively, our holding today reaffirms the rule set out in *Billiot v. Sewart Seacraft,* 382 F.2d 662, 664–65 (5th Cir.1967), which the *Leger* court rejected based on *Reliable Transfer.* Because the Supreme Court's more recent opinion in *Edmonds* reveals that *Leger* misconstrued *Reliable Transfer,* we return to the rule in effect

before *Leger* modified it. Because *Leger* was a panel decision, and the en banc court has not overruled *Billiot,* we consider *Billiot* still to be valid law. *Billiot* held that a claimant may settle with one tortfeasor, proceed against another for the total amount of the damages, and the court will deduct the amount paid by the settling tortfeasor from the recovery against the second tortfeasor. This results in the claimant receiving the exact amount of his damages. The risk or wisdom of settling in contrast to going to trial falls upon whichever tortfeasor had the best foresight.

We note that, unlike the Eleventh Circuit, the Fifth Circuit has fully endorsed the *Leger* approach, and has plainly stated the effect it can have on a seaman's recovery. *See, e.g., In re Incident Aboard D/B Ocean King,* 813 F.2d 679, 689 (5th Cir.1987); *Diggs v. Hood,* 772 F.2d 190, 196 (5th Cir.1985). Because we think this approach is inconsistent with Supreme Court doctrine, we cannot agree with the Fifth Circuit.

of fact as required by Fed.R.Civ.P. 52 concerning various claims for damages. With regard to certain issues discussed below, we agree. Rule 52 requires that the trial court "find the facts specially and state separately its conclusions of law thereon." "[T]he findings must be specifically detailed to give [an appellate court] a clear understanding of the analytical process by which ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts." *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 433 (5th Cir.1977). "This court cannot be left to guess. The findings and conclusions we review must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied." *Hydrospace-Challenger, Inc. v. Tracor/MAS, Inc.*, 520 F.2d 1030, 1034 (5th Cir.1975).

Although the district court's opinion is generally careful and thorough, it does fail to make sufficient findings to permit adequate review of Self's claims for damages. A remand for appropriate findings is the normal procedure. *See Armstrong v. Collier*, 536 F.2d 72, 77 (5th Cir.1976). A "remand is not required if a complete understanding of the issues is possible in the absence of separate findings and if there is a sufficient basis for the appellate court's consideration of the merits of the case. Where the acts relied upon to support the judgment are in the record and are undisputed remand is unnecessary." *Gulf Towing Co. v. Steam Tanker, AMOCO New York*, 648 F.2d 242, 245 (5th Cir. Unit B June 1981). As discussed below, however, Great Lakes and Self disagree about the appropriateness of certain claims for damages. In this case, we think it more appropriate for the district court to make the initial findings on these claims, because that court has had the benefit of receiving first hand all of the evidence of the events leading to Danny Self's death.

1. *Conscious Pain and Suffering*

The trial court made no findings or award of damages for conscious pain and suffering experienced by Danny Self before he died. Although the lower court's opinion makes no reference to pain and suffering, the record paints a vivid picture of the final moments of Self's life. According to Burke, the seaman who tried to save Self, men thrown into the water when the barge overturned were sucked under the water for what "seemed like an eternity." Record, Volume 24, at 61. After Burke surfaced, Self then surfaced, and Burke saw that Self had no life jacket. Burke told Self to hold on to him, which Self did. *Id.* at 62. According to Burke,

> we struggled more or less. For the most part, his feet were on my shoulders and I was kicking, trying to surface. He was on top of me. That's where we stayed. Then we hit the ship and that's when he lost it, or I lost him, however it worked out. We lost our grip on one another. I saw him leaving me. I tried to reach him, but the buoyancy of my jacket kept me up so I couldn't. And I just saw him slip under me.... I know the water was moving very swiftly.... It was cold. I don't know what the exact temperature was, but it was pretty icy to go overboard, I know that.

*Id.* at 62–64. It seems clear that Self was conscious for at least a few moments after the barge overturned and before Self and Burke lost their grip and sucked Self under the water to his death.

A damages award for conscious pain and suffering is appropriate, depending on the facts, in maritime wrongful death actions. *See Hlodan v. Ohio Barge Line*, 611 F.2d 71, 76 (5th Cir.1980); *Dickerson v. Continental Oil Company*, 449 F.2d 1209, 1216 (5th Cir.1971). In *Hlodan*, the "evidence showed that for some undetermined number of minutes before his death Hlodan was aware of his predicament, and that his death by drowning was not instantaneous." 611 F.2d at 76. In *Dickerson*, the court wrote that if "the decedent was conscious while in the water, ... then it must be without dispute that he did suffer some pain ... from the anguish of struggling against drowning." 449 F.2d at 1216. We think that in this case the district court should have made specific findings about pain and suffering damages

to which Self may be entitled. *See Lett-some v. United States,* 411 F.2d 917, 923 (5th Cir.1969) (remanding for specific Rule 52(a) findings on pain and suffering in maritime injury case).

### 2. *Unseaworthiness*

■ Similarly, the district court made no specific mention or findings about the seaworthiness of the dredge Alaska. It may be that the lower court factored a finding of unseaworthiness into the award of damages, or that the court found that the vessel was in fact seaworthy. Without any discussion of seaworthiness and of whether any unseaworthiness should enhance Great Lakes' liability to Self, however, we cannot adequately review the district court judgment. *See Glapion v. MS Journalist,* 487 F.2d 1252 (5th Cir.1973) (affirming specific findings concerning seaworthiness due to defect in ship, but remanding for specific findings concerning safety violation). In light of the district court's award of nonpecuniary damages to Self, we can almost assume that the court found the vessel to be unseaworthy. *See Ivy v. Security Barge Lines, Inc.,* 606 F.2d 524 (5th Cir. 1979) (en banc) (holding that nonpecuniary damages cannot be awarded under Jones Act). Rather than speculating, however, we prefer to allow the district court to state its findings clearly.

■ The record suggests that a finding of unseaworthiness would be plausible. Violations of safety regulations can lead to findings of unseaworthiness, *see Manning v. M/V "Sea Road,"* 417 F.2d 603 (5th Cir.1969), as can the failure to adequately train a ship's crew, *see Hercules Carriers, Inc. v. Claimant State of Florida,* 768 F.2d 1558 (11th Cir.1985). We leave to the district court on remand the determination in the first instance of questions of seaworthiness and possible enhancement of damages. *See Farbwerke Hoeschst A.G. v. M/V "Don Nicky,"* 589 F.2d 795 (5th Cir. 1979) (remanding for specific findings on unseaworthiness and damages).

### 3. *Punitive Damages*

■ As with unseaworthiness, the lower court order is silent about punitive damages. Punitive damages should be available in cases where the shipowner willfully violated the duty to maintain a safe and seaworthy ship, as was found to exist on the part of Great Lakes by the district court, or where the shipowner's acts (or failures to act) recklessly increased the danger of a disaster. In this case, Great Lakes had been warned by local pilots' association about the possibility of the exact type of collision that occurred (involving a ship shearing into the barge), yet Great Lakes chose to ignore the warnings, and may not even have passed the warnings on to the crew of the dredge Alaska. Furthermore, Great Lakes' failure to maintain adequate safety devices and procedures on the Alaska may rise to the level of willfulness or recklessness. In light of these facts, we think that some specific determination about punitive damages must be made. We will leave the initial decision to the district court on remand. *See Complaint of Merry Shipping, Inc.,* 650 F.2d 622 (5th Cir. Unit B July 1981) (remanding for findings on punitive damages).

### 4. *Prejudgment Interest*

■ Again, the lower court opinion is silent about prejudgment interest. In general,

prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. Discretion to deny prejudgment interest is created only when there are "peculiar circumstances" that would make it inequitable for the losing party to be forced to pay prejudgment interest.

*Noritake Co. v. M/V Hellenic Champion,* 627 F.2d 724, 728 (5th Cir. Unit 1980) (footnote and citations omitted). Although it is accepted practice to *award* prejudgment interest without making specific findings, *see id.* at 729, a denial of interest usually calls for specific findings.

[I]n any admiralty case in which the trial court refuses to award prejudgment interest, the best practice would be for it

to detail the peculiar circumstance it has found, and specifically indicate that it is denying prejudgment interest as an exercise of the discretion created by the existence of peculiar circumstances.

*Id.* at 729 n. 4. In the absence of clear findings by the district court, an appellate court could search the record for "peculiar circumstances" and decide to award or deny prejudgment interest without a remand. *See Noritake,* 627 F.2d at 730 (awarding interest); *Parker Towing Co. v. Yazoo River Towing, Inc.,* 794 F.2d 591, 594 (11th Cir.1986) (denying interest). In this case, however, because we are remanding to the district court for reconsideration of other possible awards of damages, we choose also to remand this question for explicit findings by the court below.[7]

### C. *Minimum Wage for Life*

■ Before his death, Danny Self did not typically work on a dredge year round (presumably because of the seasonal nature of the work). In addition to the dredge work, the district court "assume[d] Mr. Self would also work 790 hours per year ... at a job earning minimum wage." 613 F.Supp. at 1438. On appeal, Self contends that the district court erred by making this assumption, arguing that the "assumption" was not a finding of fact, and that if it was, it is clearly erroneous.

In reviewing the district court's opinion, it is not clear whether this assumption was a finding, and thus it is unclear whether the assumption deserves the deference normally accorded to findings of fact. For purposes of this decision, we will assume that the assumption *is* a finding of fact.

Having searched the record on appeal, however, we can find no evidence to support the assumption, and we thus determine that, based on the current record, it is clearly erroneous. The trial judge apparently drew the assumption from an assumption made by Great Lakes' expert. *See supra* note 12. Yet, as the expert admitted, his assumption did not take into account any experience or skills that Self would acquire in his dredging work, notwithstanding the fact that the district court found that Self would advance to the position of mate and then leverman on the dredge. By adopting the expert's assumption, the district court essentially held that a leverman (who is second only to the captain of a dredge) would hold only semi-skilled jobs during the off-months, for the remainder of his career. The assumption also ignores the uncontradicted evidence that prior to his death Self had worked in the construction field during at least one of the non-dredge periods, and that the wages in the construction field were typically higher than minimum wage. Based on the record, we thus hold that the district court's assumption is clearly erroneous.

On remand, the trial court may decide to require more evidence as to Self's non-dredge work. We do not reject the possibility that based on further evidence the trial court will conclude that Self would only earn the minimum wage for at least a portion of his career. We only hold that based on the record as it now stands, there is no support for the trial court's assumption that Self would never have earned more than the minimum wage during the periods he was not working on a dredge.[8]

---

7. A remand in this case is especially appropriate because there is a possibility that some form of interest was already calculated into the district court's award to Self. Apparently, the district court adopted without modification the pecuniary loss calculations proposed by Great Lakes' expert, *see* Record, Vol. 29 at 12–62, and there is a suggestion that these figures include some type of interest, *see id.* at 26. If, in fact, prejudgment interest was included in the award made by the court below, appellate review would have been simplified if that fact was made clear in the district court's decision, along with an explanation of how the interest was calculated.

8. We acknowledge that one likely reason behind the trial judge's adoption of the defendant's expert's assumption is that the plaintiff failed to present completely comprehensive evidence of these damages. While there is sufficient evidence in the record to make us question the trial court's assumption, we must repeat Judge Johnson's admonition that "it would behoove future litigants when preparing for trial to study carefully the horizon of damages before heading off down the trail.... The record at trial must be fully developed on the issue of damages.... Relying on an appellate court to sort through the record and calculate the appropriate damages merely delays achieving a just and reason-

## D. *Reduction of Future Wages to Present Value*

■ Self challenges on appeal the method used by the district court to calculate the present value of its award of future earnings. As Great Lakes concedes in their brief on appeal, the district court used the "case-by-case" method that was specifically rejected by the en banc court of the former Fifth Circuit in *Culver v. Slater Boat Co.*, 722 F.2d 114, 120 (5th Cir.1983) (en banc).[9] *Culver* required that courts in this circuit use the "below-market discount" method to adjust awards of future damages to present value. The district court's mistake is largely due to its reliance on Great Lakes' expert, who used the incorrect method.

In this appeal, Great Lakes argues that the error was harmless. Its expert used a 10.75% discount rate, which is substantially higher than the 1%–3% rate approved in *Culver*. Because their expert allowed for inflation in the initial calculations (contrary to the approach used in *Culver*), Great Lakes argues that the effective discount rate is only marginally higher than the 3% rate approved in *Culver*. Thus, according to Great Lakes, the use of the improper method was harmless.

For two reasons, we decline to reach the question of whether the use of the discredited case-by-case method can ever be harmless. First, the Great Lakes expert applied the too-high discount rate to *all* future damages, including those not adjusted upward for inflation. Thus, at least for certain portions of the damages award, the effective discount rate was substantially higher than is proper. Second, in light of our remand above for a reassessment of the use of the minimum wage for Danny

Self's entire life, it is likely that the entire damages figure will need to be recalculated. On remand, the district court should use the "below-market discount" method described in *Culver* and *Deakle v. John E. Graham & Sons*, 756 F.2d 832 (11th Cir. 1985).

## E. *Damage for Loss of Society*

■ The district court awarded to Mrs. Self $70,000 for the loss of society, love, and companionship of her deceased husband, and the court awarded $15,000 to each of Danny Self's two children. On appeal, Mrs. Self argues that these awards are grossly inadequate. Self cites numerous cases where $200,000 to $500,000 was awarded for loss of society. Great Lakes, on the other hand, cites cases where $25,000 to $75,000 was awarded for loss of society.

In reviewing the amount of damage awards, this court is generally limited to the question of whether the trier of fact abused its discretion. *See Hawkes v. Ayers*, 537 F.2d 836, 837 (5th Cir.1976). While the district court did not describe how it determined the amount of the awards for loss of society, we do not find any abuse of discretion in the amount. "Although the award was small, it was not 'unconscionably inadequate,' therefore, we may not disturb the award on appeal." *Kramer v. Keys*, 643 F.2d 382, 386 (5th Cir. Unit A Apr. 1981) (citation omitted). We thus affirm the district court's award of damages for loss of society.[10]

## III. GREAT LAKES' CLAIMS AGAINST CHEVRON

The remainder of this opinion deals with issues arising out of Chevron's and Great

---

ably accurate final judgment." *Dealke v. John E. Graham & Sons*, 756 F.2d 821, 834 (11th Cir.1985). If the trial court on remand concludes that plaintiff was negligent in presentation of evidence on this issue, he may reach the same conclusion as he initially reached. We remand because it is not clear to us why the minimum wage figure was used.

**9.** *Culver* is binding precedent on this court. *See Stein v. Reynolds Securities, Inc.*, 756 F.2d 821 (11th Cir.1985).

**10.** On remand, the trial court can, at its discretion, consider additional evidence on this point, and increase the award for loss of society if appropriate. We do not hold that the amount of the award is at all *required* to be at the level set by the district court, only that the level set is within the range of permissible awards.

Lakes' attempts to shift responsibility for the collision to determine apportionment of damages to their respective vessels. As discussed above, the district court found that Great Lakes was negligent toward Danny Self by failing to maintain and conduct certain required safety features and procedures. The lower court also found that Great Lakes violated the Pilot Rules for Inland Waters, 33 C.F.R. § 80.26(c) (1974) (in effect at the time of the collision), and that the violation was a contributing cause of the collision. On appeal, Great Lakes challenges this finding, as well as two other rulings made by the district court.

### A. *Violation of 33 C.F.R. § 80.26(c)*

■ The Pilot Rules for Inland Waters, in force in February of 1975, required that

> [w]hen any pipe line or swinging dredge shall have given an approaching vessel or tow the signal that the channel is clear, the dredge shall straighten out within the cut for the passage of the vessel or tow.

33 C.F.R. § 80.26(c) (1974) (no longer in effect). The district court held that Great Lakes violated that regulation because, instead of "straightening out" and bringing the line of the dredge so that it was parallel to the channel, the leverman of the dredge brought the bow closer to the bank of the river (and thus farther from the center of the channel). Great Lakes argues that the trial judge misinterpreted the regulation and that even if there was a violation of the regulation the district court incorrectly applied the rule in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), to shift the burden to Great Lakes to disprove that the violation was related to the accident.

### 1. *The Violation*

Both Chevron and Great Lakes (and Self in support of Chevron on this issue) argue that the plain language of the rule supports their positions. Chevron argues that the words "straighten out in the cut," or the channel, means just that—straighten out instead of lie at an angle. Great Lakes on the other hand argues that if the rule intended to require that a dredge be parallel to the channel, it would have so stated. After hearing testimony on the meaning of § 80.26(c), the trial judge determined that "straighten out in the cut" meant "straighten out to be parallel to the line of the cut." The court then found that Great lakes violated that rule. While a "finding of statutory fault is primarily a factual issue governed by the clearly erroneous standard," *Orange Beach Water, Sewer and First Protection Authority v. M/V Alva*, 680 F.2d 1374, 1380 (11th Cir.1982), we must review the district court's ruling to ensure that it did not misinterpret the meaning of the rule.

Great Lakes argues that the district court's interpretation that the rule means "parallel to the channel" is in conflict with the Coast Guard's interpretation of the rule; Great Lakes argues that we must defer to the agency's interpretation of its own rule. The "agency interpretation" that Great Lakes advances is the formal report made by the Coast Guard following its investigation into the collision. Great Lakes argues that in the report's conclusions, no mention was made of a violation of § 80.26(c), and this constitutes an interpretation by the Coast Guard that the rule did not mean "parallel to the channel" and thus the rule was not violated.[11] We note

---

**11.** In its brief, Great Lakes quotes from the conclusions of the Coast Guard's report: "The corrective action of moving completely out of the channel *at pilot request* (as opposed to swinging the bow over) taken by Great Lakes Dredge and Dock Company in response to the pilots [sic] letter and Coast Guard requests was adequate to allow safe navigation in the area." (emphasis added). Great Lakes argues that the quoted language suggests that Great Lakes took the appropriate action. Reading the report in its entirety, however, we reach a different con-

clusion. The report describes two methods for a dredge to move out of the way of a passing ship: swinging the bow over or moving the *entire* dredge out of the way. The report details how Great Lakes only moved the bow over. We read the quoted language to approve the other method—moving the entire dredge out of the channel. We do not perceive any conclusions about simply moving the bow over. The primary point of the Coast Guard's conclusion from which Great Lakes quoted is that the local pilots should be informed that they should, in

that, as Great Lakes concedes, the legal conclusion that Great Lakes did not violate the rule is inadmissible evidence. *See Smith v. Ithaca Corporation*, 612 F.2d 215, 223 (5th Cir.1980). We decline to take Great Lakes' invitation to construe the absence of any mention of § 80.26(c) as a formal agency interpretation of that rule. This case is quite different from cases in which an agency has formally interpreted a rule, or has promulgated an interpretation in the Code of Federal Regulations. *See, e.g., Allen M. Campbell Company General Contractors v. Lloyd Wood Construction Co.*, 446 F.2d 261 (5th Cir.1971). In this case, we have only the Coast Guard's silence, which we will not take to be a formal interpretation that "straighten out in the cut" does not mean "parallel to the channel."

In the absence of any formal interpretation by the Coast Guard of the meaning of § 80.26(c), we find that the district court reasonably relied on the testimonial evidence presented by a number of witnesses, including Coast Guard officials and a Great Lakes employee, to the effect that they would interpret the rule to mean "parallel to the channel." Great Lakes cites a number of cases involving facts very similar to those here where the courts did not find any fault in a dredge swinging its bow out of the channel. *See, e.g., The Ditmar Koel*, 65 F.2d 555 (5th Cir.1933); *The Freeport*, 99 F.2d 842 (4th Cir.1938). None of the cited cases, however, involved an interpretation of § 80.26, and there was no suggestion in any of the cases that there was a then-existing rule that the dredge arguably violated. Here, we have a rule that requires a dredge to "straighten out in the cut." After considering the rule and the testimony, we affirm the district court's

interpretation that the rule means "parallel to the channel," and that Great Lakes violated the rule.[12]

## 2. *The Pennsylvania Rule*

■ Having affirmed the district court's determination that Great Lakes violated 33 C.F.R. § 80.26(c) (1974), we must now consider the applicability of the rule set out in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), to the facts of this case. In *The Pennsylvania*, the Supreme Court held that when a ship involved in a collision is in violation of a statutory rule designed to prevent collisions, the burden shifts to that ship to disprove that the violation was a contributing cause of the collision. Specifically, the Court wrote:

> The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the cases, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*Id.* at 136, 22 L.Ed.2d at 151. In that case, the Court held that although the steamship Pennsylvania was primarily responsible for its collision with the bark Mary R. Troop, the bark was also liable because of its violation of a rule requiring the use of foghorns when underway in fog.

---

the future, request that the entire dredge be moved, instead of merely having the bow swung over.

**12.** Arguably, a commonsense approach supports Great Lakes: By swinging the bow toward shore, instead of bringing the dredge to a position parallel to the channel, Great Lakes actually brought the dredge *farther* out of the channel. As was argued below, however, a rule requiring the dredge to be parallel to the channel serves a number of plausible goals, including presenting

a lesser target for an approaching vessel and giving an approaching vessel the proper perspective of the center line of the channel. The district court presumably had this second point in mind when it concluded that the "angle at which the Alaska and [the barge] was positioned in the Drummond Creek Cut distorted the perception of the navigators of the Robert Watt Miller as the tanker came around Broward Point Turn." 613 F.Supp. at 1436.

Since its inception over one hundred years ago, *The Pennsylvania* rule has increasingly come under attack, with courts and commentators terming the rule "harsh," *Board of Commissioners v. M/V Farnsum*, 574 F.2d 289, 297 (5th Cir.1978), and "drastic," G. Gilmore & C. Black, *The Law of Admiralty* 494 (2d ed. 1975). The harshness of the rule is clear when viewed in light of the pre-*Reliable Transfer* rule of *The Schooner Catharine*, requiring equal division of damages among joint tortfeasors. *See The Pennsylvania*, 86 U.S. (19 Wall.) at 138, 22 L.Ed. at 152. Prior to *Reliable Transfer*, a ship that violated a rule but could not overcome *The Pennsylvania* burden would be liable for an equal share of the damages caused by a collision, even though the violation only marginally contributed to the collision. Critics have advocated the rule's abolition, *see* Tetley, *The Pennsylvania Rule—An Anachronism? The Pennsylvania Judgment—An Error?* 13 J.Mar.L. & Com. 127 (1982), and courts, including the former Fifth Circuit, have ensured that *The Pennsylvania* burden is not insurmountable, *see Compania de Maderas de Caibarien v. The Queenston Heights*, 220 F.2d 120, 122–23 (5th Cir.1955).

Great Lakes goes beyond criticizing *The Pennsylvania* rule, however, and argues that the rule has been overturned by the Supreme Court in *United States v. Reliable Transfer Co. See supra* at 1545. In support of this claim, Great Lakes cites a Ninth Circuit case which includes language suggesting that *The Pennsylvania* decision was overruled by *Reliable Transfer. See People of the State of California v. Italian Motorship Ilice*, 534 F.2d 836, 840 (9th Cir.1976). Great Lakes, however, misunderstands the effect of *Reliable Transfer* and misreads the Ninth Circuit's *Ilice* decision, which expressly refused to disturb an application of *The Pennsylvania* rule by the district court in that case. *Id.*

What Great Lakes misunderstands, and what the Ninth Circuit noted, is that the adoption of comparative fault by the Supreme Court in *Reliable Transfer* did nothing to overturn *The Pennsylvania* rule, but instead simply eased the rule's harshness.[13] Prior to *Reliable Transfer*, a ship unable to overcome *The Pennsylvania* rule bore an equal portion of the liability; after *Reliable Transfer*, a ship that violated a statutory rule is only liable in proportion to the comparative degree of fault for the accident.

To make clear what the rule set out in *The Pennsylvania* is still viable, we note that *The Pennsylvania* involved presumptions and burdens of proof, while the *Reliable Transfer* case involved divisions of liability. The goals underlying *The Pennsylvania* rule—a concern that maritime rules be strictly observed—were not in the least disturbed by the *Reliable Transfer* decision. "The clear general rule is that the navigational rules are 'rigorously enforced' and strictly interpreted." *Garrett v. Higgenbotham*, 800 F.2d 1537, 1540 n. 6 (11th Cir.1986) (citing *Belden v. Chase*, 150 U.S. 674, 698, 14 S.Ct. 264, 271, 37 L.Ed. 1218 (1893)). "Masters [of ships] are bound to obey the rules, and entitled to rely on the assumption that they will be obeyed...." *Belden*, 150 U.S. at 699, 14 S.Ct. at 272. The need to strictly enforce maritime rules is as strong today as it was in 1874, and the *The Pennsylvania* decision announced one hundred years ago still furthers that purpose. We thus find that the district court appropriately applied *The Pennsylvania* rule to this case, and we affirm the district court's finding that Great Lakes did not meet its burden under that rule.[14]

**13.** Even the critics of *The Pennsylvania* rule acknowledge that *Reliable Transfer* did not overturn it. *See* Tetley, *supra*, 13 J.Mar.L. & Com. at 145.

**14.** Great Lakes also argues that the presumptions of *The Pennsylvania* rule should not be applied in the face of the seemingly conflicting presumptions found in *The Oregon*, 158 U.S.

186, 15 S.Ct. 804, 39 L.Ed. 943 (1895), which held that when a moving vessel strikes an anchored one a presumption of negligence on the part of the moving vessel arises. We do not see these presumptions as conflicting—together they only suggest that both Great Lakes and Chevron are presumptively liable (Great Lakes for its rule violation and Chevron because of its

### B. *Exclusion of Commander Cavallero's Deposition*

Great Lakes challenges the failure of the district court to admit into evidence at least portions of a deposition taken by the parties of Coast Guard Commander Samuel Cavallero. Commander Cavallero was the investigating officer who prepared the formal Coast Guard report on the collision. *See supra* at 1552–1553. The report, although not its conclusions, were admitted; the trial judge refused to admit the deposition.

When Great Lakes attempted to have the deposition read into evidence, Chevron objected and argued that the deposition was "all hearsay." The trial judge decided to review the deposition overnight. *See* Record, Vol. 27 at 148–53. The following morning, after reading most of the deposition, the trial judge ruled that the deposition could not, in its entirety, be admitted; he stated that the "great majority of it is hearsay." He did admit all exhibits that were properly identified in the deposition. *See* Record, Vol. 28 at 32. On appeal, Great Lakes argues that the judge committed error by refusing to admit the deposition.

 We have reviewed the challenged deposition in its entirety, and agree with the district court's conclusion that most of the deposition is hearsay. On appeal, Great Lakes points to specific small portions of the deposition that would arguably be admissible. Great Lakes, however, did not bring any of these passages to the attention of the district court, and made no requests to admit specific portions. When a document a party seeks to admit is full of inadmissible material, it is incumbent on the party to specifically note the admissible sections. The district court cannot be expected to wade through a 129–page deposition pulling out the handful of admissible exchanges in the document. We affirm the refusal of the district court to admit the deposition in its entirety, and we hold that Great Lakes cannot attempt on appeal to gain the admission of specific passages when Great Lakes did not present those passages to the district court. If any of the passages were vitally important to Great Lakes' defense, as they claim on appeal, they should have raised them to the district court. A district court will almost always be willing to consider specific sections of a document that is not admissible in its entirety.

### C. *Great Lakes' Claim for Indemnity*

Great Lakes challenges the district court's order, entered before the trial, granting Chevron's motion for summary judgment on Great Lakes' claim for indemnity from Chevron. At the time the motion was granted, Great Lakes argued that it might be held liable based only on a technical finding of unseaworthiness, and that in such a case Great Lakes had a right to indemnity from Chevron based on the concepts of active and passive negligence. The district court rejected this argument, and granted Chevron's motion. Great Lakes retained, of course, a right to contribution from Chevron.

 In *Loose v. Offshore Navigation, Inc.,* 670 F.2d 493 (5th Cir.1982), the new Fifth Circuit considered arguments similar to those presented here by Great Lakes. As that court indicated, the active-passive negligence doctrine was a device aimed at easing the burden of the equally-divided-damages rule of *The Schooner Catherine.* As discussed above, however, the Supreme Court rejected that rule in favor of comparative fault in *United States v. Reliable Transfer,* 421 U.S. 397, 95 S.Ct. 1708, 44

---

status as the moving vessel). In any event, the district court explicitly, and appropriately, weighed the competing presumptions of *The Pennsylvania* and *The Oregon* cases in determining the proportionate fault of the two vessels in question. *See Complaint of Chevron Transport Corporation,* 613 F.Supp. at 1436.

In a footnote in its brief, Great Lakes also argues that *The Pennsylvania* rule may conflict with the general burdens of persuasion set out in Fed.R.Evid. 301. We reject the suggestion that the Federal Rules of Evidence altered *The Pennsylvania* rule. We agree with the Fifth Circuit that the adoption of the federal rules did not modify the substantive burdens and presumptions long established in federal admiralty law. *See James v. River Parishes Co.,* 686 F.2d 1129, 1133 (5th Cir.1982).

L.Ed.2d 251 (1975). The Fifth Circuit noted that it "is difficult to see the need for the active-passive indemnification rule in a comparative fault system." *Loose,* 670 F.2d at 501–02. That court abolished the active-passive negligence rule. We agree with this reasoning, and hold that in an admiralty case where the district judge assesses the relative degrees of fault, there is no place for the active-passive negligence doctrine. A tortfeasor only passively negligent will presumably bear a smaller percentage of the fault for an injury. If, because of other rules and obligations, a passively negligent tortfeasor initially pays more than its share, it can seek contribution from the more active tortfeasor. In the case below, the district court granted partial summary judgment on the issue of indemnity, and left the possibility of contribution available. We affirm the district court on this point.

## IV. CHEVRON'S CLAIMS AGAINST GREAT LAKES

■ On appeal, Chevron argues that the district court erred by denying its complaint seeking limitation of liability under the 135–year old Limitation of Liability Act, 46 U.S.C. § 183 (1986). According to that act, the

> liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity of knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

*Id.* § 183(a). As this court has detailed, a determination of whether a shipowner is entitled to limit his liability involves a two-step analysis.... "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must

determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." Moreover, once a claimant satisfies the initial burden of proving negligence or unseaworthiness, the burden of proof shifts to the shipowner to prove the lack of privity or knowledge. *Hercules Carriers, Inc. v. Claimant State of Florida,* 768 F.2d 1558, 1563–64 (quoting *Farrell Lines, Inc. v. Jones,* 530 F.2d 7 (5th Cir.1976)) (other citations omitted).

In the limitation of liability context, the district court's findings about negligence, unseaworthiness, privity, and knowledge are considered on appeal to be factual findings subject to review under the clearly erroneous standard. *See Hercules Carriers, Inc.,* 768 F.2d at 1565. Chevron argues in this appeal, however, that the district court erred as a matter of law in finding negligence, privity, and knowledge. Because we read the district court's opinion differently than Chevron, and we think Chevron misunderstands the lower court's holding, we affirm the district court's refusal to allow Chevron to limit its liability.

According to Chevron's briefs on appeal, the district court ruled that Chevron was negligent because a critical Notice to Mariners discussing the dredging operation was not on board the Robert Watt Miller at the time of the collision. Chevron points to the district court's statement that "there is no evidence that the notice ... ever reached the Robert Watt Miller," 613 F.Supp. at 1437, and argues that the district court impermissibly shifted the burden of proof on the issue of negligence away from Great Lakes and onto Chevron. Chevron argues that while there was no evidence that the notice was on the ship, there also was no evidence that the notice was *not* on the ship. Thus, according to Chevron, Great Lakes did not carry its burden of proof. *See Hercules Carriers, Inc.,* 768 F.2d 1564.

Chevron, however, mischaracterizes the district court's holding. In the district court's opinion, the question of the Notice to Mariners does not form the basis of the negligence proven by Great Lakes, but instead goes to privity, an issue on which

Chevron has the burden of proof. The negligence found by the district court is in the fact that Chevron allowed the master of its ship to sail into "unfamiliar waters" "completely unaware" of the dangers that lay in its path. 613 F.Supp. at 1437. Having made this finding of negligence (which is supported by the record), the district court turned to the issue of privity. The burden was then on Chevron to prove that it was unaware of the potential problem. On that issue, the district court looked to adequacy of the distribution system for maritime notices and found it lacking. Because the district court ruled that Chevron should have been aware of the faults in its information dissemination system, the court ruled that Chevron was not entitled to limit its liability. *Id.* After having reviewed the record, and taking into account the shifting burdens of proof, we cannot say that the district court was clearly erroneous in any of its findings on this point. We thus affirm the denial of Chevron's complaint seeking to limit its liability.[15]

### V. CONCLUSION

For the reasons discussed above, we affirm in part and reverse in part the judgment of the district court, and we remand this case for further proceedings in accordance with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**15.** Both the Chevron Transport Corporation, the owner of the Robert Watt Miller, and the Chevron Shipping Company, the managing agent responsible for the operation of the ship, have sought to limit their liability. Because of our affirmance of the district court on this point, we do not reach the question of when, if ever, a managing agent can utilize the Limitation of Liability Act. *See In re Amoco Transport Co.,* 1979 A.M.C. 1017 (N.D.Ill.1979) (refusing to permit managing agent to limit its liability).