James P. RUFOLO, Plaintiff–Appellee,

v.

**MIDWEST MARINE CONTRACTOR, INCORPORATED, Defendant– Counter Plaintiff–Appellant,**

and

Service Welding & Shipbuilding, Incorporated, Defendant–Counter Defendant–Appellee.

No. 92–1593.

United States Court of Appeals, Seventh Circuit.

Argued April 30, 1993.

Decided Sept. 29, 1993.

Ernest T. Rossiello, Rossiello & Associates, Chicago, IL, argued for plaintiff-appellee Rufolo.

Edward M. Kay (argued), James T. Ferrini, Susan Condon, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, IL, for defendant-appellant Midwest Marine Contractor, Inc.

Donald E. Schlyer, William P. Ryan, Griffith, IN, argued for defendant-appellee Service Welding & Shipbuilding, Inc.

Before CUMMINGS and MANION, Circuit Judges, and EISELE, Senior District Judge.*

* The Honorable Garnett Thomas Eisele, Senior District Judge for the Eastern District of Arkan-

CUMMINGS, Circuit Judge.

This case was brought under the Jones Act, 46 U.S.C.App. § 688, and general maritime law. The plaintiff, James Rufolo, a shipping pilot, slipped and fell and hurt his back on the oil-slicked stairway of a barge called the M/V Shoreline II. Rufolo sued Midwest Marine Contractor, Inc., the barge's charterer, and Service Welding & Shipbuilding, Inc., a firm whose arguably negligent repair work on the vessel may have caused oil to collect on the stairs. Midwest Marine brought a cross-claim against Service Welding for indemnification and contribution. A jury found that the M/V Shoreline II was unseaworthy and that Midwest Marine was negligent. It awarded Rufolo $375,000, which was reduced to $251,000 because the plaintiff was found to have been 33 percent negligent. Before trial, though, Rufolo and Service Welding agreed to settle for $1,000. The district judge held that this settlement excused the ship repair outfit from liability; Midwest Marine of course disagrees. Last year in *Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279 (7th Cir.1992), we were able to avoid deciding under federal maritime law what effect the settlement of one defendant has on another. Able to escape this question no longer, we opt for a settlement-bar rule.[1] This means that in a maritime case, a settling party is excused from liability for contribution if the settlement is in good faith. Midwest Marine claims that Service Welding's $1,000 settlement with Rufolo was not in good faith, but the district judge disagreed, as do we.

Rufolo was a seaman pilot working for Midwest Marine out of Chicago, primarily on Lake Michigan aboard the M/V Shoreline II, a self-propelled jack-up barge. The barge's most distinctive feature is legs, or spuds as they are called, which can be lowered by hydraulics and attached to the bottom of the lake, and then lifted again when the barge is in motion. The barge is used to take crew members out to sea so that divers can work under water. In September 1988 the M/V Shoreline II was partially capsized because of vandalism. Service Welding was hired to repair the hydraulic jacks on the spuds. Midwest Marine later engaged Modern Fluid Technology, Inc. to replace the vessel's hydraulic pump. Modern Fluid recommended that additional work be done on the hydraulics, but Midwest Marine declined. The barge was in a state of great disrepair at this time: the engine batteries were dead, part of a starboard spud had fallen off, hydraulic fluid leaked constantly from the legs. In Rufolo's words, the vessel was a "mess," but Midwest Marine continued to operate it. On the day of the accident, June 2, 1989, the M/V Shoreline II plied the waters from Kenosha, Wisconsin, to Evanston, Illinois.

Off the Evanston coast, Captain Paul Rufolo (the plaintiff's father) raised the M/V Shoreline II out of the water despite the missing foot on the starboard spud. The captain then returned to shore and left his son in charge. Later in the afternoon the younger Rufolo decided to raise the barge another couple of feet notwithstanding the constant hydraulic leak in the rear leg. At some point during this operation a hydraulic pipe on the deck burst and spewed twenty-five to thirty gallons of oil across the deck. Rufolo and two deckhands tried to clean up the spill, which left hydraulic fluid at least two or three inches deep at the entrance to the engine room. After a time they ran out of cleaning materials and Rufolo decided not to call the Coast Guard for more supplies

sas, is sitting by designation.

1. The concurring opinion suggests that we could avoid deciding this question because under Rule 51 of the Federal Rules of Civil Procedure, Midwest Marine waived any objection concerning its liability by failing to submit a jury instruction about the settlement with Service Welding, despite an invitation by the district judge to do so. However, Rule 51 says merely that one may not object to a jury instruction if one has not submitted an alternative. Midwest Marine does not object to any jury instruction; therefore, Rule 51 is inapplicable. To find waiver in these circumstances would mean that a party must invite error. Midwest Marine should not have been required to submit a jury instruction based on claim reduction guidelines because claim reduction is not the law of this circuit and could not be under our decision in *Matter of Oil Spill By The Amoco Cadiz*, 954 F.2d 1279, 1318 (1992). If the district judge had accepted such an instruction as the concurrence says Midwest Marine should have submitted, we would now be reversing that decision for error.

because "[i]t's a lot of problems when you involve the Coast Guard in a little minor clean-up" (transcript of Dec. 9, 1991 at 424). The men went to the galley to watch television and eat dinner. Rufolo was later beckoned by a crew member to help start one of the engines. But on his way down the still-treacherous stairs to the engine room, where the safety grid on the second step from the top was missing, Rufolo in his oil-soaked shoes slipped and fell and sustained the injuries that gave rise to this suit. In his trial testimony, Rufolo admitted seeing the oil on the stairs—not much of an admission since the oil spill had been several inches deep and Rufolo had just spent an hour trying to clean it up. The jury sorted out the various liabilities of the parties under the Jones Act and general maritime law, and as noted found that Midwest Marine owes Rufolo $251,000; the district judge found that Service Welding, having settled with Rufolo separately, owes Midwest Marine nothing.

■ Midwest Marine's first argument is that it cannot be sued by the plaintiff because he owns it. Actually, he owns 10 percent of Midwest Marine's stock; his mother, father and two sisters own the rest. We assume that the reason a party sues a company of which he is part owner is because someone other than the company (usually an insurance carrier) is footing the bill. In any event, the Jones Act creates a cause of action for seamen who are injured by the negligence of owners of unseaworthy vessels. Rufolo cites a district court case from Washington state, *Strom v. M/V "Western Dawn"*, 698 F.Supp. 212, 214 (W.D.Wash.1986), for the common-sense proposition that one must be an employee, not an owner, to have a cause of action against a ship's owners under the Jones Act. As the statute says, "Any seaman who shall suffer injury in the course of his employment may, at his election, maintain an action for damages at law * * *." 46 U.S.C.App. § 688(a). "The key to seaman status is employment-related connection to a vessel in navigation." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355, 111 S.Ct. 807, 817, 112 L.Ed.2d 866; see also *Southwest*

*Marine, Inc. v. Gizoni*, —— U.S. ——, ———, 112 S.Ct. 486, 490–491, 116 L.Ed.2d 405. The district court held that *Strom* was not binding because it involved partnership and Washington state law.

In any event, we cannot accept Midwest Marine's contention that Rufolo was not an employee. In *Strom*, the plaintiff was an active partner who had helped design the very gate latch system that caused his injury. 698 F.Supp. at 214. Rufolo, by contrast, is merely a 10 percent shareholder in a corporation and was not shown to be active or influential in its business affairs. Of course the stockholders own the corporation. But mere ownership of some small amount of stock cannot deprive one of employment status; otherwise, the thousands of workers who have invested in the companies that employ them or received stock options as compensation would be deprived of the protections Congress intended to provide to seamen when it passed the Jones Act. *Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1548 (11th Cir.1987), certiorari denied, 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604.[2] In this case we have no evidence that the younger Rufolo acted in an ownership capacity other than sometimes serving as captain when the actual captain was absent. Also, whatever hand Rufolo might have played in causing his own injuries—by, for example, making bad decisions as acting captain—were taken into account by the jury when it found him 33 percent negligent.

■ Rufolo would have been able to collect his award from either defendant had he not settled on the eve of trial for $1,000 with Service Welding. The district court applied the Illinois Contribution Among Joint Tortfeasors Act, 740 ILCS 100/1, rather than federal law, and concluded that Service Welding extinguished its liability to Midwest Marine when it settled separately with Rufolo. We agree with that result but hold that the district court should have applied federal maritime law rather than Illinois contribution law. *Amoco Cadiz* left open the choice of law question, 954 F.2d at 1315, but other circuits that have considered rules of contri-

<hr>

**2.** A subsequent Eleventh Circuit case, *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*, 957 F.2d 1575 (1992), does not detract from this principle.

bution in admiralty cases have fashioned federal law and not relied on state law. See *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521; *Associated Elec. Coop., Inc. v. Mid–America Transp. Co.,* 931 F.2d 1266 (8th Cir.1991); *Miller v. Christopher,* 887 F.2d 902 (9th Cir.1989); *Hernandez v. M/V Rajaan,* 841 F.2d 582 (5th Cir.1988), certiorari denied, 488 U.S. 981, 109 S.Ct. 530, 102 L.Ed.2d 562, 488 U.S. 1030, 109 S.Ct. 837, 102 L.Ed.2d 970; *Self,* 832 F.2d 1540 (11th Cir.1987); *Joia v. Jo–Ja Serv. Corp.,* 817 F.2d 908 (1st Cir.1987), certiorari denied, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654. The benefit of applying federal law in admiralty is uniformity. *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 373, 79 S.Ct. 468, 480, 3 L.Ed.2d 368. Service Welding points out the obvious—not all circuits have opted for the same rules of contribution—and would have us conclude that uniformity is not served by applying federal admiralty law. But federal law promises at least the potential of uniformity should the Supreme Court decide the issue. And even a circuit split here or there gives parties eminently greater guidance and reliability than having to discern a different rule for every state. We conclude, therefore, that this case should be decided under federal, not Illinois, law.

■ As we explained in *Amoco Cadiz,* there are four potential rules. In a no-contribution system, all defendants are jointly and severally liable, the plaintiff may collect the entire award from any defendant, and no defendant may obtain contribution from any other. A contribution system is the same as a no-contribution system except that a defendant who pays more than his share of the apportioned fault may be reimbursed by other defendants. In a claim reduction world, defendants are also jointly and severally liable, but if the plaintiff settles with one defendant, the non-settling defendants are excused from any damages caused by the settling party. For example, if three defendants are each a third liable and one settles, the plaintiff may only collect two-thirds of the award from the non-settling parties. Fi-

nally, a settlement bar excuses a settling defendant from all liability (that is, other defendants cannot obtain contribution from him) so long as the settlement is made in good faith. *Amoco Cadiz,* 954 F.2d at 1315. None of the approaches is a panacea, *id.* at 1318, and there is certainly no uniformity among the circuits.[3] Even the Restatement (Second) of Torts § 886A has not decided which rule to adopt. The concurrence argues in favor of the claim reduction rule, but this option complicates litigation and lowers recoveries for the injured, and in any event was expressly foreclosed by *Amoco Cadiz. Id.* at 1316 (quoting *Edmonds,* 443 U.S. at 268–273, 99 S.Ct. at 2760–2763).

It is clear that the Supreme Court still adheres to the principle that an injured party may collect the whole amount of his award from any defendant. *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251; *Edmonds,* 443 U.S. 256, 99 S.Ct. 2753. As the Court noted in *Edmonds,*

> Nothing is more clear than the right of a plaintiff, having suffered such a loss, to sue in a common-law action all the wrong-doers, or any one of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss.

443 U.S. at 260 n. 7, 99 S.Ct. at 2756 n. 7 (quoting *The Atlas,* 93 U.S. 302, 315, 23 L.Ed. 863). But the principle enunciated in these cases—redress plaintiff's deprivation first and let the defendants fight over the scraps later—offers no guidance about how to treat settling parties since each contribution rule already incorporates the notion that plaintiff compensation takes precedence. *Miller,* 887 F.2d at 904. We are at liberty, therefore, to choose any of these contribution systems and we opt for the settlement bar. Its advantages are obvious: parties can buy certainty. If they work out a deal sufficiently appealing to the plaintiff, defendants can evade the hazards of trial and the pitfalls of post-trial contribution. There is thus a huge incentive to settle cases. We are mindful that courts should not shirk their duty to

---

**3.** See *Amoco Cadiz* for the status of each rule in the various circuits. 954 F.2d at 1315–1318.

decide genuine cases and controversies by tipping the scales so heavily in favor of settling that it never pays to adjudicate, but considering how clogged the court system is and how bulging the federal reporters have become, it is appropriate to encourage parties to negotiate their own solutions. One drawback of the settlement bar is that defendants who go to trial may be saddled with an unfair share of the liability merely because they are available to sustain the jury's wrath for the defendants' collective wrongdoing. But that logic would counsel against all settlements not joined by every defendant. Also, the good faith requirement ensures that plaintiffs and settling parties do not scheme to put the onus unfairly on the remaining defendants, although having to ensure that settlements are in good faith can be a drawback if a mini-trial is required to determine the true extent of a party's liability. *Amoco Cadiz*, 954 F.2d at 1317.

But no solution is perfect, *id.* at 1318, and we think the settlement bar comes closer than the alternatives. A no-contribution system, though easy for courts to administer, creates massive distortion by saddling defendants who may be only slightly at fault with complete liability and no recourse for collecting from the other wrongdoers. The contribution alternative eliminates that problem, but it also makes settling a nearly worthless proposition because even if a defendant settles, he is still responsible for his full share of the fault. The only benefit to settling in such circumstances is to save on litigation costs, but since the settling defendant is responsible anyway, he is likely to want to participate in the trial to control how much of the wrongdoing is attributed to him. Also, the burdens of administering a contribution system—figuring out how much fault belongs with each current and former defendant—are staggering. In short, we think the settlement bar has the most advantages and the fewest drawbacks. See *Miller*, 887 F.2d at 903–907.

The settlement bar approach is also consistent with the district court's determination of these parties' liabilities under Illinois law. Under the Illinois Contribution Among Joint Tortfeasors Act, 740 ILCS 100/1, where a joint tortfeasor reaches a good faith settlement, the claimant is released from liability for contribution to other joint tortfeasors. *Frazer v. A.F. Munsterman, Inc.*, 123 Ill.2d 245, 123 Ill.Dec. 473, 527 N.E.2d 1248 (1988); *Ballweg v. City of Springfield*, 114 Ill.2d 107, 102 Ill.Dec. 360, 499 N.E.2d 1373 (1986). Because Service Welding chose to settle with the plaintiff before trial, it is completely immune to the $251,000 judgment rendered against Midwest Marine—that is, so long as the settlement of $1,000 was in good faith. Midwest Marine contends that it wasn't.

The district court disagreed. It found no reason "to think that this case is being settled for anything other than what it's worth" (transcript of Nov. 1, 1991 at 11–12). Good faith equates with a bona fide estimate of liability at trial, *Amoco Cadiz*, 954 F.2d at 1315, and a district court's decision to approve a settlement will be upheld barring an abuse of discretion. *Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir.1985). The gist of Midwest Marine's argument is that, having asked for $500,000 in damages from two defendants, the plaintiff's decision to settle for $1,000 from one defendant is tantamount to bad faith. But we are unwilling to say that a disproportionately low settlement in relation to the amount of liability found at trial automatically demonstrates unsavory collusion; a low settlement may merely reflect that plaintiff has a weak case against the settling defendant. Rufolo's counsel explained the $1,000 settlement in oral argument as a matter of basic trial strategy: get rid of the weak link in your case and go head to head with one defendant rather than two. The settlement with Service Welding did not come until extensive discovery had been completed. Clearly, Rufolo had it within his power not to have sued Service Welding in the first instance. It is logical to assume, then, absent some evidence to the contrary, that the plaintiff learned in discovery that he would be better served at trial by concentrating on Midwest Marine alone. Why? The most obvious reason to have discarded the case against Service Welding is that it only fixed the hydraulic systems on the spuds, or legs, while the oil spill that prompted Rufolo's fall down the engine room stairs came from a hydraulic pipe on the deck. Service

Welding was not the only firm to work on the hydraulics either; a firm called Modern Fluid Technology replaced a hydraulic pump on the deck. Rufolo may have simply calculated that the jury would find Service Welding innocent of wrongdoing and thus dilute the case against Midwest Marine, about whom there was ample evidence of wrongdoing: ignoring Modern Fluid's suggestion that the hydraulics undergo further repairs, continuing to operate the M/V Shoreline II when its condition was so fragile, allowing oil to collect on the stairs as a matter of course, and failing to replace a missing grid on the second step. Midwest Marine sent to the witness stand an expert who tried to foist all the blame on Service Welding, but there were expert witnesses on the other side and the jury was entitled to disbelieve Midwest Marine's witness. Not only is there no evidence of bad faith in the settlement, but Midwest Marine has not suggested, and we cannot conceive of, any reason why plaintiff would have colluded with Service Welding. There is no suggestion Rufolo received information or anything else from Service Welding that benefitted him in the trial. If any party suffered from the low settlement figure, it was Rufolo, not Midwest Marine.

Midwest Marine last argues that it should be indemnified by Service Welding. In the classic indemnity case in maritime law, the owner of the ship has relinquished control of the vessel to another party whose negligence subjected the owner to liability. *Ryan Stevedoring Co. v. Pan–Atlantic Steam Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; *Boyle v. Pool Offshore Co.,* 893 F.2d 713, 719 (5th Cir.1990); *Bass v. Phoenix Seadrill/78, Ltd.,* 749 F.2d 1154, 1167 (5th Cir.1985); *Hobart v. Sohio Petroleum Co.,* 445 F.2d 435, 438 (5th Cir.1971), certiorari denied, 404 U.S. 942, 92 S.Ct. 288, 30 L.Ed.2d 256. But Midwest Marine never relinquished control of the M/V Shoreline II and the jury plainly found that Midwest Marine bore the brunt of fault for Rufolo's accident.

To summarize, we hold that Rufolo has standing as a seaman-employee under the Jones Act to bring this suit, that the federal law of admiralty applies rather than Illinois law, that a settling defendant is excused from contribution so long as the settlement is made in good faith, and that this settlement was indeed conceived of and executed in good faith. For these reasons, the district court's decision is affirmed.

EISELE, Senior District Judge, concurring.

The majority states: "Last year in *Matter of Oil Spill by the Amoco Cadiz,* 954 F.2d 1279 (7th Cir.1992), we were able to avoid deciding under federal maritime law what effect the settlement of one defendant has on another. Able to escape this question no longer, we opt for a settlement-bar rule." I disagree. We could, and should, "escape" the contribution rule question by deciding the case on a narrow issue.

Midwest Marine has waived any objection concerning whether its liability exceeds its proportionate share of fault by failing to submit proper jury instructions. Rule 51 states in part: "No party may assign as error the giving or *failure to give* an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." This has always been the rule in federal courts. *Mill Owners Mutual Fire Insurance Co. v. Kelley,* 141 F.2d 763, 765 (8th Cir.1944). Further, when dismissing Midwest Marine's Cross–Complaint for Contribution, the trial court stated:

> This does not in my judgment, leave [Midwest Marine] holding the bag either, because at trial you are entitled to have your liability, according to the cases, limited to your proportional fault. And I suppose that you take care of that by way of instruction to the jury at trial.

(T. of 11–1–91, P. 7). Yet, despite Rule 51 and the trial court's admonitions, Midwest Marine did not submit a jury instruction or jury verdict form that would have directed the jury to apportion fault between it and Service Welding. In fact the jury verdict and special interrogatories form proposed by Midwest was submitted to the jury. The form does not provide for any allocation of fault to Service Welding. Indeed, it calls only for the apportionment of fault between the plaintiff, Rufolo and Midwest and makes

454

it clear that the total of those percentages must equal 100%. Midwest argues, and the majority agrees, that for Midwest to submit an instruction limiting its liability to its proportionate fault or calling upon the jury to apportion fault between it and Service Welding would have been to invite error on the theory that "claim reduction is not the law of this circuit and could not be" under *Amoco*. See footnote 1 to majority opinion. But I disagree that claim reduction cannot be the law of the circuit. Indeed, in the discussion below I strongly urge the adoption of the claim reduction rule by this Circuit. Believing that Midwest has waived this issue, I concur in the result reached by the majority.

The majority arrives at the same result—excusing the settling tortfeasor, Service Welding, from contribution—by applying the settlement-bar rule. The majority justifies its adoption of the settlement-bar approach as follows:

> We are at liberty, therefore, to choose any of these contribution systems and we opt for the settlement bar. Its advantages are obvious: parties can buy certainty. If they work out a deal sufficiently appealing to the plaintiff, defendants can evade the hazards of trial and the pitfalls of post-trial contribution. There is thus a huge incentive to settle cases. We are mindful that courts should not shirk their duty to decide genuine cases and controversies by tipping the scales so heavily in favor of settling that it never pays to adjudicate, but considering how clogged the court system is and how bulging the federal reporters have become, it is appropriate to encourage parties to negotiate their own solutions. One drawback to the settlement bar is that defendants who go to trial may be saddled with an unfair share of the liability merely because they are available to sustain the jury's wrath for the defendants' collective wrongdoing. But that logic would counsel against all settlements not joined in by every defendant. Also, the good faith requirement ensures that plaintiffs and settling parties do not scheme to put the onus unfairly on the remaining defendants, although having to ensure that settlements are in good faith can be a drawback if a mini trial is required to determine the true

extent to a party liability. *Amoco Cadiz,* 954 F.2d at 1317.

While I agree with my brothers that federal law controls the contribution rules in admiralty cases such as this, I disagree with the majority's choice of contribution rules.

The question of the appropriate federal maritime contribution rule to apply between joint tortfeasors, when one has settled with the plaintiff, has not been resolved by the United States Supreme Court. Since the Circuits are not in agreement, it is probable that the Supreme Court will eventually decide the question. In the meantime we are called upon to use our best judgment in choosing a rule which will most fairly and efficiently deal with the federal issue presented. Since the majority has reached this issue, it is my judgment that the claim reduction rule, rather than the settlement-bar rule, will more nearly meet these objectives.

The issue of how to best address the right of contribution against a settling joint tortfeasor in an admiralty action has resulted in several different approaches and considerable disagreement over which is the best. Before an analysis is made of the contribution rule that should be applied, it will be helpful to review some general tort principles.

The threshold question in cases involving multiple defendants is whether the negligence of the plaintiff, if any, is to be compared to *each* defendant or against the total of *all* the defendants. The majority and better view is to compare the combined negligence of all defendants against the plaintiff's negligence. Henry Woods, *Comparative Fault* 2d ed. § 13.1 (1987). At common law, once the judgment was entered against joint tortfeasors, the liability was joint and several. This concept was not initially changed by the introduction of comparative negligence. Each tortfeasor whose negligence was a proximate cause of an indivisible injury remained individually liable for all compensable damages attributable to that injury. *Id.* at § 13.4 [citing Prosser, *The Law of Torts,* § 47 (4th ed. 1871)]. The rule was potentially harsh for defendants because, at common law, there was no contribution among joint

tortfeasors. As a result, there have been judicial and statutory initiatives to avoid the consequences of the no contribution rule. One approach has been to eliminate joint and several liability—replacing that concept with an apportionment of individual liability on the basis of each joint tortfeasor's percentage of fault. While this method is particularly fair to individual defendants, since each defendant's liability is limited to the harm he or she caused, it subjects the plaintiff to the risk of each defendant's solvency. The second inroad on the no contribution rule has been the development of various contribution formulas. An apportionment of damages among joint tortfeasors on an equitable basis has developed as a result of the growth and acceptance of comparative negligence in tort law. In fact, in admiralty actions, the rule of "no contribution" is no longer viable. *Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). "[A] 'more equal' distribution of justice can best be achieved by ameliorating the common-law rule against contribution which permits a plaintiff to force one of two wrongdoers to bear the entire loss, though the other may have been equally or more to blame." *Id.* at 110–111, 94 S.Ct. at 2177.

The question that remains, and the question before the Court in this case is: which of the possible contribution rules should this Circuit adopt? I agree with the majority that existing precedent, both from the Supreme Court and the Seventh Circuit, "offers no guidance about how to treat settling parties since each contribution rule already incorporates the notion that plaintiff compensation takes precedence" and "[w]e are at liberty, therefore, to choose any of these contribution systems...."

At the other end of the spectrum from no contribution is the rule of full contribution. This alternative would permit a contribution claim by tortfeasor A against joint tortfeasor B notwithstanding the fact that tortfeasor B had settled with the plaintiff. This full contribution approach, however, has the distinct disadvantage of discouraging settlement. *The Matter of the Oil Spill By the Amoco Cadiz*, 954 F.2d 1279, 1317 (7th Cir.1992). A defendant has little incentive to settle if,

subsequent to his settlement, he can be held to additional liability in a contribution action by a nonsettling joint tortfeasor.

Once it is decided that neither a "no contribution" rule nor a "full contribution" rule will be followed, two additional questions must be answered. First, the Court must determine whether fault should be distributed proportionately or on an equal pro rata basis among the joint tortfeasors. Second, the Court must determine what effect a settlement and release by one tortfeasor has on the remaining tortfeasor.

In answer to the first question, the better rule is to distribute fault among tortfeasors on a proportionate fault basis rather than on an equal pro rata basis. This is true even though the 1939 and 1955 versions of the Uniform Contribution Among Tortfeasors Act provided for pro rata contribution. The equal pro rata basis simply divides the total damages by the number of tortfeasors. As a result, the percentage of harm caused by each tortfeasor is not reflected in the distribution of liability among the tortfeasors. Such an outcome is inequitable. The early resistance to proportionate contribution is most likely explained by the prevailing negative attitude throughout the first half of this century towards any system that smacked of comparative fault. The optional provision of the 1939 Uniform Act, which permitted proportionate assessment of fault, has been uniformly approved by commentators and in recent years has received almost universal acceptance. Proportionate assessment of fault among defendants more accurately reflects the reality of wrongdoing. *See generally* Henry Woods, *Comparative Fault* 2d ed. § 13.4–7 (1987). Under an allocation system based upon relative fault, the more culpable tortfeasor will bear the greater share of the loss, but a less culpable joint tortfeasor will not escape all liability (as was the case under a no contribution system) and will not overpay as he or she would under an equal pro rata contribution system.

A second question the Court must ask is whether a settlement by one tortfeasor has any effect on other joint tortfeasors. At common law, a recovery and satisfaction of a judgment against one tortfeasor discharged

all the others. This rule was abrogated by the Uniform Act which stated that a release by one joint tortfeasor does not release the others unless it specifically so provides. The effect of a settlement is to release the *settling* defendant, but the effect on the plaintiff and the nonsettling defendants has remained an open question to this point. The two most frequently suggested rules to apply when one tortfeasor has settled are the "settlement bar rule" and the "claim reduction rule."

Under the settlement bar approach, assuming the settlement was made in good faith, the settling tortfeasor escapes any liability for contribution. Following settlement, the settling tortfeasor's involvement in the action ends. He is discharged. The nonsettlers receive credit for the dollar amount paid by the settlers. Thus, the plaintiff may recover the entire amount of the judgment, less the amount that the plaintiff had already collected from the settling tortfeasor. Under the settlement bar approach, defendants are encouraged to settle since settlement buys peace. Plaintiffs, likewise, will negotiate settlements since there is no disincentive from their perspective. A plaintiff may collect the full amount of his damage award regardless of whether the prior settlement reflected an accurate picture of the economic harm caused by the settling tortfeasor. To some extent, this resurrects some of the problems with the "no contribution" rule by allowing the plaintiff to pick and choose with whom to settle. One defendant may be forced to pay damages far in excess of the proportionate share of harm he or she caused. The settlement bar rule encourages quick, partial settlements but potentially frustrates complete and just settlements. A plaintiff can receive some money initially by settling, all the while knowing that the remaining nonsettling tortfeasor will be responsible for the balance of any damage award. Such an environment creates the opportunity for improper dealmaking and collusive settlements. To a limited extent this problem can be overcome by requiring the settlement, which extinguish the other defendants' right of contribution, to be subject to a good faith requirement. However, the monitoring and inquiry into good faith impose new burdens on the courts. Both from an administrative and practical

standpoint, I respectfully disagree with the majority that "the good faith requirement ensures that plaintiffs and settling parties [will] not scheme to put the onus unfairly on the remaining defendants ..." A mini-trial concerning the merits of the settlement will usually be required to determine whether the liability assumed by the settling tortfeasor is reasonably related to the strength of the plaintiff's claims. And there may be hidden, and difficult to ferret out, considerations in such settlement agreements which such bobtailed "good faith" hearings are not likely to identify.

The other approach is what *Amoco Cadiz* refers to as the claim reduction rule. *Amoco Cadiz*, 954 F.2d at 1315. This rule, like the settlement bar rule, bars contribution from the settling tortfeasor. Claim reduction, however, adopts the comparative fault approach in that it restricts the plaintiff's recovery against the nonsettling tortfeasor to that defendant's proportionate share of fault. Under this rule, the plaintiff forgoes the right to collect from nonsettling defendants any damages attributable to the settling party's share of fault. The plaintiff's total recovery consists of the amount he received from the settling tortfeasor plus the amount represented by the nonsettling tortfeasor's proportionate share of fault. The majority states that the claim reduction rule complicates litigation and lowers recoveries for the injured. I disagree. It is true that recoveries under the claim reduction rule *may* be lower. The ultimate recovery by the plaintiff under the claim reduction rule (also known as the proportionate fault rule) depends upon the settlement the plaintiff reaches with a settling defendant and whether the plaintiff settles with the deep-pocket defendant or with the less affluent defendant. If the plaintiff settles with a defendant for that defendant's proportionate degree of fault (or for more), then the claim reduction rule will not result in a lower recovery. If, however, the plaintiff settles with one defendant for less than his proportionate degree of fault, then the plaintiff's recovery will be for less than 100% of the damages since his recovery against the second defendant is limited to the second defendant's proportionate fault. Such

an outcome is simply a reflection of the risk of settling.

Additionally, I would suggest that if the claim reduction rule is not followed, collusive settlements will often result. A plaintiff would seldom settle with a deep-pocket defendant. Under the settlement-bar approach the plaintiff would settle, fairly or unfairly, with the less affluent defendant, knowing that the deep-pocket defendant was available to pick up the tab. While we do not want a plaintiff's injuries to go uncompensated, the result discussed above seems abusive to the nonsettling defendant when the plaintiff settles with the first defendant for substantially less than that defendant's proportionate degree of fault. And, in my opinion, the good faith test is not an adequate protection against such abuses, the incentives for which are obvious.

The majority states:

> None of the approaches is a panacea, *id.* at 1318, and there is certainly no uniformity among the circuits. Even the Restatement (Second) of Torts § 886A has not decided which rule to adopt. The only option we have on an earlier occasion ruled out is claim reduction because it complicates litigation and lowers recoveries for the injured. *Id.* at 1316 (quoting *Edmonds*, 443 U.S. at 268–273, 99 S.Ct. at 2760–2763).

It is clear that the Supreme Court still adheres to the principle that an injured party may collect the whole amount of his award from any defendant. *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251; *Edmonds,* 443 U.S. 256, 99 S.Ct. 2753. As the court noted in *Edmonds,*

> Nothing is more clear than the right of the plaintiff, having suffered such a loss, to sue in a common-law action all the wrong-doers, or anyone of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss.

443 U.S. at 260 n. 7, 99 S.Ct. at 2756 n. 7 (quoting *The Atlas,* 93 U.S. 302, 315, 23 L.Ed. 863).

But does precedent rule out our adoption of the claim reduction rule? The majority acknowledges that the Circuit did not adopt the settlement bar approach in *Amoco.* In fact *Amoco* stated:

> "Whether to follow *Joia* by allowing *Amoco* contribution from ABS, or *Self* by adopting the settlement bar rule, is a question for another day."

And only in dicta did the panel state it would not have adopted the claim reduction approach.

If the majority reads *Edmonds* as advancing a full contribution rule, then neither the settlement bar rule nor the claim reduction rule would be available to this Court since both recognize the effect of settlement and *prohibit the plaintiff from collecting the full damage amount from any one defendant.* Under both rules, the plaintiff's recovery from the nonsettling tortfeasors is limited or reduced by an amount that is related to the settling tortfeasor (either the amount paid by him or her in settlement under the settlement bar approach or that tortfeasor's proportionate share of fault expressed as a dollar amount under the claims reduction approach). If, however, the majority is reading *Edmonds* as allowing a settlement to reduce the amount that can be collected from a nonsettling tortfeasor, then either rule (the claim reduction rule or the settlement bar rule) is available to this Court. The latter reading is preferable since, as noted by the Eighth Circuit in *Associated Electric Co-op v. Mid–America Transp.,* 931 F.2d 1266 (8th Cir.1991), *Edmonds* did not involve settlement issues and thus the language quoted therefrom by the majority is dicta. The issue in *Edmonds* involved the avoidance of tort liability by payment of statutorily required benefits, rather than a negotiated settlement of claims between the plaintiff and defendant. "Thus, *Edmonds* does not involve the public policy considerations at issue in this case, such as the need to deter collusive settlements without deterring legitimate ones." *Id.*

One criticism often levied against the claim reduction rule is that the plaintiff, by settling with one defendant, may receive less than the full compensation awarded in a final

judgment since his recovery from the nonsettling defendants is reduced by the settling defendant's share of fault. That criticism only expresses one side of the equation, however. If the plaintiff recovers more money in settlement than is represented by the settler's percentage of fault as found by the jury, he has made a favorable settlement; if less, a bad settlement. Since a settlement is an agreement reached between a plaintiff and defendant concerning the amount of money owed by the defendant to the plaintiff for the harm that he has caused, it is obvious that the parties may over or under estimate the value of the plaintiff's claim. Such an agreement naturally involves the tradeoff of a certain recovery in exchange for the relinquishment of a possibly more lucrative recovery at trial. Both parties must analyze the risk/return ratio of going to trial. When the plaintiff voluntarily chooses to settle, limiting the remaining nonsettling tortfeasors' liability to an amount commensurate with the degree of fault of each does not unduly burden the plaintiff. More importantly it results in the fair and just disposition of the plaintiff's claims against the non-settling joint tortfeasors. And it avoids the slippery "good faith" analysis required by the settlement-bar rule. As stated by the Eighth Circuit in *Associated Electric Co-op v. Mid–America Transp.*, 931 F.2d 1266 (8th Cir.1991):

> Unlike the contribution bar approach, the proportional fault approach deters collusive settlements by limiting the plaintiff's recovery against non-settling defendants to a sum accurately reflecting such defendants' negligence. Unlike AEC's preferred approach allowing contribution suits, the proportional fault approach does not discourage defendants from settling by subjecting them to the risk of contribution suits from non-settling defendants. Admittedly, the proportional fault approach creates some risk that plaintiffs might either receive double recovery from a generous settlement or be deterred from settling because a plaintiff's settlement could be offset by a reduction at trial of his or her recovery. *See Leger*, 592 F.2d at 1248–50 (rejecting non-settling defendant's concerns about double recovery); Restatement § 886A comment m (expressing con-

cern that proportional fault approach might deter settlement). Because some settlements are more favorable than others, we believe these risks balance each other out. *Cf. Leger*, 592 F.2d at 1250 n. 10 (noting that "[s]ettlement dollars may be worth more or less than judgment dollars, depending on which party received the more favorable settlement.")

In sum, we hold that when the Teasleys' claims against AEC come to trial, the court should reduce "the claim that the injured party [Teasley] has against the other tortfeasors [AEC] by the amount of the equitable share of the obligation of the released tortfeasor [MATCO]." Restatement § 886A comment m.

Again, the claim reduction rule creates some risk for the plaintiff and a settling defendant. But no one should complain since the plaintiff and the settling defendants have resolved their differences *by agreement* and the nonsettling defendants will only have to bear the proportionate loss occasioned by their own fault. See *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246, 1250 n. 10 (5th Cir.1979).

Yes, there are positives and negatives in any solution that we might adopt. But, if the most just and fair resolution of such admiralty cases is our prime concern, then we should opt for the claim reduction rule.