[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13963
Non-Argument Calendar
_____

D.C. Docket No. 9:11-cv-80988-KLR

CORDELL FUNDING, LLLP,

Plaintiff - Counter Defendant -Appellee,

versus

JOEL JENKINS,

Defendant - Counter Claimant -Appellant,

IRWIN R. GILBERT,

Defendant - Counter Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 12, 2018)

Before WILSON, JORDAN and BLACK, Circuit Judges.

PER CURIAM:

This case began when Cordell Funding, LLLP (Cordell) brought suit against Joel Jenkins in the Southern District of Florida, alleging he breached an agreement to guarantee a $3.5 million loan Cordell extended to North Andros Assets, Ltd., a Bahamian company (North Andros). Following a bench trial, the district court found in favor of Cordell and entered judgment against Jenkins in the amount of $1 million. Jenkins appeals. He contends the district court failed to set forth its findings of fact and conclusions of law as it was required to do under Fed. R. Civ. P. 52(a). After review, we agree, and we remand the case to the district court to make such findings.

## I. BACKGROUND

Cordell's amended complaint alleges the following facts. On December 16, 2005, Cordell agreed to lend $3.5 million to North Andros for the acquisition and development of real estate in Nassau, Bahamas. The loan was secured by a mortgage on the subject property (the Property). To provide further security, the owners of North Andros, including Jenkins, pledged their shares in the company to Cordell in the event of a default. In addition, the same individuals, once again including Jenkins, personally guaranteed the loan. In August 2006, Cordell lent

2

North Andros an additional $500,000, bringing the total amount borrowed to $4 million.  Jenkins executed a second guaranty for the additional $500,000 loan.

According to the complaint, North Andros defaulted and ceased making payments in December 2006.  Thereafter, interest accrued on the unpaid balance at twenty percent per annum.  Cordell alleged that Jenkins refused to pay the balance in breach of his agreement to guarantee North Andros's loan.

Jenkins defended these allegations pro se.  The case proceeded to a bench trial held on January 27 and 28, 2014.  Cordell presented, among other witnesses, its in-house bookkeeper to testify to the amount outstanding on the loan.  The bookkeeper produced a spreadsheet showing that approximately $8 million in interest and fees had accrued on the outstanding balance, which totaled roughly $3.5 million after credited payments.  The testimony also revealed that Cordell had exercised its right to vote the shares of North Andros upon default, and had caused North Andros to sell the Property on July 18, 2013, for $9 million.  The sale price was credited to North Andros's debt, resulting in an alleged remaining balance of $2,565,837.21 due under the loan.  Cordell contended Jenkins was obligated to guarantee that sum.

Although Jenkins spent the majority of his time arguing that he was not liable because he had been a service member on active duty in the Air Force while interest accrued and at the time the lawsuit commenced, Jenkins also suggested

3

Cordell's sale price was artificially low.  As it turned out, the sale was not an arms-length transaction; Cordell sold the Property to a related entity known as The Palm at West Bay Limited (The Palm).  Cordell's managing partner testified that $9 million "was the highest value we could envision on this property," apparently, in part, because the Property had been vandalized.  Little more was made of the valuation issue, however, and Jenkins continued to focus on his former status as an active duty service member.

Towards the end of the second day of the proceedings, Jenkins interrupted his own cross examination of one of Cordell's witnesses to ask the court if he could be represented by an attorney by the name of Gerald Richman.  Curiously, there was some question as to whether Richman, who was present at the proceeding, had a conflict of interest resulting from another suit against Jenkins that Richman had filed on behalf of another client.  The court indicated its concern and stated it would not allow the representation, but permitted Richman to be heard on the matter.  Richman indicated that if the court would allow him to represent Jenkins, he would show there was no deficiency because Cordell had not proven the fair market value of the property at the time of the sale was less than the outstanding debt.  In other words, the price set between North Andros (after default, controlled by Cordell) and The Palm (related to Cordell) was arbitrary.  While a $9 million sale price resulted in a deficiency under the loan, a $20 million

4

sale price, for example, would have resulted in a substantial surplus, leaving nothing for Jenkins to guarantee. The court indicated it was unwilling to "go down that road" because the evidence was already closed. Instead, it instructed Richman to sit down and the parties gave their closing arguments.

Nevertheless, Richman's momentary appearance was not without effect. The court interrupted Cordell's closing argument to inquire about the value of the property. The court asked Cordell to produce an appraisal from the relevant time period showing the Property justified a $9 million dollar price. The court recognized such a request was "rather bizarre," but given that Jenkins had been representing himself throughout the proceeding, it would accommodate him.

The bench trial was completed on January 28, 2014. Cordell submitted an appraisal in accordance with the court's instructions. However, the appraisal was purportedly delivered orally at the time it was made in 2013, but was not reduced to writing until January 2014, only a few weeks before trial. About a month later, the court held a hearing in which it expressed concern about the appraisal date and the appraiser's qualifications. At the hearing, Jenkins moved for reconsideration of the court's decision to deny his request for Richman to represent him. The court granted the motion and decided the trial should begin again "from scratch."

Proceedings resumed on November 21, 2014. Jenkins, now represented by Richman, asked the court to open the evidence further and look at the value of the

property in 2010, not just on the date of the sale in 2013. If Cordell had control of the property and the ability to sell it in 2010, Jenkins argued, then its decision to wait until 2013 to sell it while interest accumulated at twenty percent created the deficiency where there was none to begin with. The court, over Cordell's objection, decided to "open [the case] up further because we have a pro se defendant who didn't know how to defend this case," and because questions of Bahamian law could pertain to the question of whether Cordell had control of the Property. Accordingly, the court decided to rehear the evidence and look at each of the issues it now determined could be relevant: the date the default occurred; when the right to sell was triggered; and what the value of the Property was at that time. The trial proceeded accordingly for the remainder of the day and again on December 10, 2014, the final day of trial.

However, it appears these newly discovered issues were lost amidst the continuing chaos of the proceedings, which were, in the district court's understated description, "very unorthodox." Instead, the court began to focus on an issue seemingly of its own creation, namely, whether the debt was extinguished by a de facto merger of Cordell and North Andros when Cordell took control of North Andros's shares. By the end of two days of trial, punctuated by legal arguments, numerous objections, and disputed evidentiary admissions, the district court determined the case boiled down to that single issue of law, framed as follows:

6

[T]his really isn't an issue of fact that I have. If, if the plaintiff is correct, and I've looked at their spreadsheet, and if this is what they received, there is a total owed before expenses of 2,565,000-some-odd dollars, and if there are no offsets or problems to that, you'd be entitled to what he's asking for, a million dollars,[1] against Mr. Jenkins. On the other hand, if there's some legal significance to pledging stock and voting it, and if that would cause a merger between the, the lender and the owner, then it would have to compute what the balance would be due then, and I think everybody agrees it was less than 9 million, then I would say there's no deficiency. So, the only thing I'm interested in is a question of law . . . .

Accordingly, the court ordered supplemental briefing on four issues of

Florida law:

[1] Who has the authority to vote shares that are held in trust? [2] Does the lender's holding the borrower's shares in trust constitute a merger of interests so as to extinguish the debt? [3] Does the lender's holding the shares in trust and then voting the shares constitute a merger of interests between the lender and borrower so as to extinguish the debt? [4] What is the effect of Cordell holding itself out on real estate listings as the owner?

Following briefing, the district court entered a "Post-Trial Order on Issue of

Merger." The order made findings of fact specific to the issue of whether a de

facto merger occurred between North Andros and Cordell when Cordell took

control of North Andros's shares upon default. It found that Cordell and North

Andros had not merged, and thus, that the debt had not been extinguished. The

---

[1] Cordell apparently restricted its claim against Jenkins to $1 million due to considerations of Bahamian law, though its amended complaint makes no mention of such a limitation.

7

court then summarily entered judgment against Jenkins in the amount of $1 million.

Jenkins moved for reconsideration, asserting the district court should have made findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a) on the other matters relevant to Jenkins's liability, such as whether Jenkins breached the guaranty agreement or whether Cordell suffered actual damages.  The court denied the motion, stating that it had "considered all the evidence presented at trial in reaching its conclusion that the merger issue was dispositive, and the [prior] order provides a thorough analysis of the facts and law relating thereto." The court denied reconsideration and declined to amend the judgment, and Jenkins filed this appeal.[2]

---

[2] Jenkins raises the possibility that the district court did not have subject matter jurisdiction because the parties were not completely diverse, but we find no merit in his contention.  The district court found that Cordell was a citizen of Virginia, New York, New Jersey, and the Cook Islands by virtue of the citizenship of its partners.  It was also possibly a citizen of Florida, but the court found it unnecessary to inquire any further because Jenkins was a Georgia citizen.  Jenkins contends this was error and that he was actually a citizen of Florida because he was allegedly in the process of beginning a new life there when the case was filed. For an individual, citizenship is determined by domicile, and it is well established that "[a] person's domicile is the place of his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom." *Sunseri v. Macro Cellular Partners*, 412 F.3d 1247, 1249 (11th Cir. 2005) (quotation omitted). The evidence showed that at the time of the suit, Jenkins lived in Georgia, where he owned a home, voted, and paid property taxes.  Whatever his intentions at that time, his "true, fixed, and permanent home and principal establishment" was Georgia, not Florida.  The district court did not clearly err in so finding.  *See McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002) ("This Court reviews the district court's findings regarding domicile under a clearly erroneous standard.").  Hence there was complete diversity, regardless of whether Cordell was a Florida citizen or not.

## II. DISCUSSION

We agree with Jenkins that the district court ought to have made more extensive Rule 52(a) findings.  The rule states that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  In a breach of contract action under Florida law such as this one, the plaintiff must plead and establish:  "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)).  The absence of any findings relevant to these elements under Rule 52(a) sheds no light on how the district court resolved them, effectively precluding appellate review.  *See Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1549 (11th Cir. 1987) ("The findings must be specifically detailed to give an appellate court a clear understanding of the analytical process by which ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts." (quotation and alterations omitted)); *McCawley v. Ozeanosun Compania, Mar., S.A.*, 505 F.2d 26, 30 n.4 (5th Cir. 1974) (noting that the "purpose of this rule is to facilitate appellate review").

Whether there was a de facto merger that extinguished the debt is surely relevant to the breach of contract action, but it is not clear to us why it should have

9

been dispositive on its own.  That is, the district court did not make prerequisite factual findings regarding the extent of any deficiency under the loan, and whether and how any such deficiency affected Jenkins's breach of the guaranty or damages resulting therefrom.  The court stated multiple times that it "considered all of the evidence presented at trial," and accordingly that only the merger issue was relevant, but it did not explain the factual and legal basis for that conclusion and as such left us without any means to review its decision.  *See Self*, 832 F.2d at 1549 ("The findings and conclusions we review must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied." (quotation omitted)).  Accordingly, we remand and instruct the court to make findings of fact and conclusions of law in accordance with Rule 52(a).  *Tejada v. Dugger*, 941 F.2d 1551, 1555 (11th Cir. 1991) ("[F]ailure to do so [to make Rule 52(a) findings] usually result[s] in a vacated judgment or a case remanded for appropriate findings . . . .").

## III. CONCLUSION

For the foregoing reasons, we **REMAND** this case for factual findings and conclusions of law to be made pursuant to Rule 52(a).